## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WAFAA ELWAKIN, ET AL.**                                **CIVIL ACTION**

**VERSUS**                                               **NO: 11-2648**

**TARGET MEDIA PARTNERS**                                **UNITED STATES**
**OPERATING COMPANY LLC**                                **MAGISTRATE JUDGE**
                                                         **KAREN WELLS ROBY**

### ORDER

Before the Court is **Defendant's Motion for Summary Judgment (R. Doc. 41),** filed by

Defendant, Target Media Partners Operating Company, LLC, ("Target"), seeking dismissal of all

claims filed against it in the instant matter by Plaintiff, Wakaa Elwakil, ("Elwakil").[1]  The motion

was set to be heard on the briefs on Wednesday, August 29, 2012, and was continued until

September 5, 2012.  The motion is opposed.  (R. Doc. 44).  Target has submitted a Reply

Memorandum in support of its Motion.  (R. Doc. 56).

Also before the Court are three motions filed subsequent to Target's motion for summary

judgment.[2]  The first motion is Elwakil's **Motion to Strike Exhibits and Affidavit Submitted by**

---

[1] Elwakil was incorrectly named as "Wafaa Elwakin" in her original petition.  (R. Doc. 1-1, p. 2).

[2] Filing a motion to strike is no longer the correct method for challenging an affidavit submitted in support of a summary judgment motion or oppositions.  "Prior to December 1, 2010, the proper method by which to attach an affidavit was by filing a motion to strike.  Under the now-applicable Federal Rule of Civil Procedure ("Rule") 56(c)(2), however, it is no longer necessary for a party to file such a motion; instead, the party may simply object to the material."  *Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012) (citing, e.g., Fed. R. Civ. Proc. 56, advisory committee's note to 2010 amendments).  "If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial."  Fed. R. Civ. Proc. 56 ( advisory committee's notes to 2010 amendment).  However, the plain language of the revised rule does not expressly proscribe filing of motions to strike.  Therefore, for the sake of ease the Court

**Target Media Partners Operating Company, LLC (R. Doc. 45)**, seeking an Order from the Court striking two documents submitted by Target in support of its Motion for Summary Judgment: the Affidavit of Linda Coffman ("Coffman") (R. Doc. 41-8), and the entirety of Exhibit E, which is comprised of three documents generated by the Kenner Police Department, as well as a print-out of a judicial charge pertaining to Domineck.  (R. Doc. 41- 9).  The motion is opposed.  (R. Doc. 47). The motion was set to be heard on the briefs on September 12, 2012.

The second motion is Target's **Defendant's Motion to Strike Portions of the Affidavits of Plaintiff and of Anthony Giusti (R. Doc. 51)**, seeking an Order from this Court striking portions of the affidavits of Elwakil and Anthony Giusti ("Giusti") which Elwakil submitted in support of her opposition to Target's Motion for Summary Judgment.  The motion is unopposed.  The motion was  noticed for submission on September 26, 2012, and set for hearing on the briefs.

The third motion is Elwakil's **Motion to Strike Exhibits Submitted with Reply Memorandum and Alternatively for Leave to File Surreply (R. Doc. 57)**, seeking an Order from this Court either striking newly filed exhibits attached to Target's Reply Memorandum at R. Doc. 56, or alternatively allowing Elwakil to file a sur-reply.  The motion is opposed.  (R. Doc. 58).  The motion was noticed for submission on October 3, 2012, and set for hearing on the briefs.

Because the third Motion was noticed for submission on October 3, 2012, and disposition of the third Motion impacts consideration of Target's Motion for Summary Judgment, consideration was inappropriate until this time.  The Court will dispose of all four motions in the course of this Order.

---

will continue to consider these filings "motions to strike."

## I.     **Factual Background and Procedural History**

This suit pertains to Elwakil's allegations that her former employer, Target, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"),[3] and "other statutory or regulatory prohibitions against discrimination and harassment and retaliation for complaints of invidious discrimination and/or harassment." (R. Doc. 1-1, ¶ 13). Elwakil, an Arab, Egyptian, Muslim woman, alleges that she was unlawfully discriminated against by Target on the basis of her ethnicity, religion, and/or national origin. (R. Doc. 1-1, ¶ 6).[4]

In her Complaint, Elwakil alleges that on or about February 1, 2009, her former white male manager with whom "plaintiff had no issues related to discrimination" was replaced by a female African American manager, Toya Domineck ("Domineck"),[5] who made negative comments about Elwakil's ethnicity, religion, and/or national origin. (R. Doc. 1-1, ¶¶ 5-6). Elwakil further alleges that on February 23, 2009, shortly before her separation from Target, Domineck physically threatened her during a sales meeting attended by other employees. (R. Doc. 1-1, ¶ 7). She alleges that these actions were not taken against employees who were not Arab, Egyptian, or Muslim. *Id.* Finally, Elwakil's complaint generally alleges that she was required to perform work that other Target employees were not required to perform, that she was held to a higher work standard and

---

[3]On October 20, 2009, Elwakil filed a Charge of Discrimination with the U.S. Equal Opportunity Commission ("EEOC"). (R. Doc. 7-4, p. 3). In her EEOC Charge of Discrimination, Elwakil brought charges of discrimination based on race, national origin, and religion, as well as retaliation. (R. Doc. 7-4, p. 1). The EEOC issued Elwakil a Notice of Right to Sue on March 29, 2011. (R. Doc. 1-1, ¶ 11). Elwakil filed the instant complaint in the 24th Judicial District Court of Jefferson Parish, LA on June 27, 2011, and her complaint was duly removed to this Court on October 21, 2011. (R. Doc. 1).

[4]Elwakil's allegations were previously held sufficient to establish "plausible claim of relief" under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) in connection with Target's 12(b)(6) Motion to Dismiss. *See* (R. Doc. 28).

[3]The spelling of Domineck's last name changes from "Domineck" to "Dominique" throughout the course of the pleadings. For the sake of simplicity, the Court will use "Domineck" to refer to her throughout the Order.

required to work more quickly than other Target employees.  (R. Doc. 1-1, ¶ 8).[6]

On November 14, 2011, Target moved to dismiss the case.  (R. Doc. 7).  On February 29, 2012, the Court issued an Order granting Target's Motion to Dismiss in connection with Elwakil's state law claims of negligence, discrimination, harassment, retaliation, and other torts.  (R. Doc. 28, p. 10).  The Court denied Target's Motion as it related to Elwakil's Title VII claims, stating that Elwakil's claims of discrimination and retaliation survived the 12(b)(6) motion.  *Id.* at 11.  In so doing, the Court's Order specified that in connection with Elwakil's discrimination claims, "[t]he Court liberally construes [Elwakil's] allegations as claims for disparate treatment and hostile work environment."  *Id.* at 7.

On January 30, 2012, Target moved for summary judgment on Elwakil's remaining claims. (R. Doc. 25).  The Court dismissed this motion without prejudice when Target voluntarily withdrew it on the grounds that Elwakil had begun complying with Target's discovery requests.  (R. Doc. 31).

## II.    Law and Analysis

### A.    Motions to Strike

The three motions to strike are directed towards affidavits and other exhibits submitted in support of Target's motion for summary judgment, as well as Elwakil's response to the same.

#### 1.    Plaintiff's Motion to Strike Exhibits and Affidavit Submitted by Target Media Partners Operating Company, LLC (R. Doc. 45)

In support of its Motion, Elwakil argues that Target's Motion for Summary Judgment relies heavily on the Affidavit of Linda Coffman ("Coffman Affidavit") and the "various papers" contained in Exhibit E ("Exhibit E Papers").  (R. Doc. 45, p. 1).  Elwakil concedes that both the

---

[6]The case has already been subject to one Motion for Summary Judgment filed by Target, which was dismissed without prejudice.  *See* (R. Docs. 22, 35).

Coffman Affidavit and the documents comprising Exhibit E support the issue of whether Target had a non-discriminatory reason for termination of Elwakil's employment. *Id.* at 2. However, Elwakil argues that both can be excluded as inadmissible evidence. *Id.* Both the Coffman Affidavit and the Exhibit E Papers will be handled in turn.

### a.    Coffman Affidavit

### i.    Failure to Notarize and Subsequent Amendment

In support of her motion, Elwakil argues that the Coffman Affidavit, as it was presented in Target's Motion for Summary Judgment, is not notarized, and therefore it is not a sworn declaration. *Id.* Additionally, the Coffman Affidavit does not contain the specific language which would render it substantially equivalent to a sworn affidavit for purposes of 28 U.S.C. § 1746.

In opposition, Target states that it neglected to notarize the Coffman Affidavit, but that it should be permitted to re-file the Affidavit according to Fifth Circuit precedent in these circumstances. (R. Doc. 47, pp. 1-2) (citing *In re Favre*, 345 Fed. App'x 5 (5th Cir. 2009).

Both parties agree that the original affidavit was not notarized. *Compare* (R. Doc. 45-1, p. 2), *with* (R. Doc. 47, pp. 1-2). This failure makes the Affidavit incompetent evidence for summary judgment. *See Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1305-06 & n.9 (5th Cir. 1988) (noting that an unsigned affidavit which failed to state that it was made under penalty of perjury was properly stricken from consideration of summary judgment motion). Further, the Affidavit does not meet the criteria for "unsworn affidavits" contained at 28 U.S.C. § 1746 because this statute also requires the person making the verification to state that the declaration is made "under penalty of perjury," 28 U.S.C. § 1746, but no such exact or equivalent statement appears in the Coffman Affidavit. Therefore, the affidavit as originally submitted is inadmissible.

The issue is then whether Target's subsequent remedial measures suffice to cure the initial defect.  Fifth Circuit courts have permitted refiling of affidavits submitted in support of summary judgment motions in other circumstances.  *See, e.g.*, *United States v. Filson*, 347 Fed. App'x 987, 991 (5th Cir 2009) (permitting refiling of affidavit which properly authenticated records); *Johnson v. New South Federal Savings Bank*, 344 Fed. App'x 955, 956-57 (5th Cir. 2009) (finding that supplemental affidavit cured defects regarding amount of taxes paid in a certain year).  Other federal courts have found that an initial failure to notarize could be cured by the submission of amended affidavits.  *See Cooper v. Upshur County Constable's Office*, 2008 WL 2035809, at *4 (E.D. Tex. May 12, 2008) (finding, on summary judgment, that party's submission of amended affidavits in response to opposing party's motion to strike permitted consideration of affidavits' content); *Contreras v. Suncast Corp.*, 237 F.3d 756 (7 th Cir. 2001) (finding, on appeal, that district court allowing party to resubmit affidavits was not reversible error).

Here, Target was notified of Elwakil's objection on August 24, 2012, and it responded expeditiously - on September 4, 2012.  *Cf. In re Favre*, 342 Fed. App'x 5, 8-9 (5th Cir. 2009) (finding that party had waived right to object to deficiencies in summary judgment motion where party waited over eight months to respond).  The Court finds that these circumstances indicate that Target cured the initial defect in the Coffman Affidavit, which can now be considered competent summary judgment evidence.

### ii.      Admissibility of Certain Statements

### (A)     Paragraph 44

The next issue is whether any portions of the Coffman Affidavit should be struck on the grounds that they are inadmissible as evidence.  (R. Doc. 45-1, p. 2).  Specifically, Elwakil raises a challenge to Coffman's Paragraph 44 on the basis of hearsay.  Paragraph 44 reads:

6

44.     The Plaintiff resigned in a telephone call to Domineck on February 11, 2009 and then changed her mind later that day after her resignation was accepted.

(R. Doc. 41-8, p. 4).  Elwakil argues that Paragraph 44 contains double hearsay as Coffman describes a telephone call between Elwakil and Domineck where Elwakil purportedly informed Domineck that she was resigning from Target.  *Id.*  In opposition, Target argues that Paragraph 44 is not hearsay because it is not offered for the truth of what Elwakil asserted, but instead shows what Elwakil and Domineck understood about that phone call, and that Coffman believed that Elwakil was resigning and then Elwakil changed her mind.  (R. Doc. 47, p. 3).[7]

Federal Rule of Civil Procedure ("Rule") 56 "states that a court may consider only admissible evidence in ruling on a summary judgment motion."  *Mersch v. City of Dallas, Tex.*, 207 F.3d 732, 734-35 (5th Cir. 2000).  Under the Federal Rules of evidence, "'[h]earsay' is a statement, other than one made by the declarant . . . offered to prove the truth of the matter asserted."  Federal Rule of Evidence ("F.R.E.") 801(c).  "Hearsay is not admissible except as provided by these rules." *Id.* at 802.  An exception to hearsay exists for "[a] statement of the declarant's then existing state of mind . . . (such as intent, plan, motive, design, [and] mental feeling . . .), but not including a statement of memory or belief to prove the fact remembered or believed."  F.R.E. 803(3).  The state of mind at issue in the hearsay statement must be relevant to the cause under consideration.  *See Prather v. Prather*, 650 F.2d 88, 90 (5th Cir. 1981).  F.R.E. 803(3) "by its own terms . . . expressly

---

[7]Target also argues that "Coffman is establishing that Domineck never said anything different about what transpired like, 'I terminated her.'" (R. Doc. 47, p. 3).  There is nothing in this statement that establishes this contention.  Further, Target argues that "Earlier in the Affidavit, Coffman discusses her awareness of the email exchange and her awareness of Toya Domineck's decision to let the resignation stand.  She obviously had conversations with Domineck and what consulted about what was going on with Plaintiff."  *Id.*  This argument cannot assist in establishing that Coffman's statement is not hearsay.  First, in contrast to earlier statements where Coffman says she was *aware* that Elwakil was fired, Paragraph 44 contains no such assertion, but makes a flat assessment that this transpired.  Second, the fact that Coffman "obviously" conversed with Domineck and understood "what was going on" with Elwakil's employment situation does not warrant contravention of the hearsay rule.

7

excludes from the operation of the rule a statement of belief to prove the fact believed." *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980). *See also United States v. Liu*, 960 F.2d 449, 452 (5th Cir. 1992) (finding that, in connection with a statement that declarant was "scared" because he had been threatened, evidence of declarant's fear was admissible under the rule, but the alleged underlying reasons for the fear were excluded).

In this case, Paragraph 44 is clearly hearsay because they are being offered for the truth of what they say, regardless whether it is introduced for the purpose of showing what Domineck or Coffman "understood" about the call.  Moreover, the information contained in the call is already contained in Domineck's affidavit, and Domineck was an actual participant in the call.  (R. Doc. 41-7, pp. 1-2).  In her Affidavit, Domineck states that she sent Coffman an email regarding Elwakil's resignation.  *Id.* at 2.  Coffman's Affidavit indicates that Domineck in fact notified Coffman regarding Elwakil's resignation via email, and the email was attached to Target's Summary Judgment Motion.  (R. Doc. 41-7, p. 8; 41-8, p. 1).  In sum, Elwakil's motion to strike is granted.

### (B)      Paragraphs 23, 24, 26, and 27

Elwakil further argues that Paragraphs 23, 24, 26, and 27 of the Coffman Affidavit all start with the language "[t]o the best of my knowledge" and contain negative propositions - which is insufficient to prove that Coffman had a basis for her assertions.  (R. Doc. 45-1, p. 4).  In opposition, Target argues that as to Paragraphs 23, 24, 26, and 27[8] of Coffman's affidavit are admissible because presumably a company Vice President who attended a staff meeting where an alleged assault occurred would be aware of complaints submitted to Target's Human Resources Department.  *Id.*

---

[8]Target's Motion actually states "23 ,24, 26 and 26."  (R. Doc. 47, p. 3).  However, since Target's response contains arguments for four paragraphs as did Elwakil's Motion, it is clear that Target meant to state "27" instead of "26."  *Id.*

at 2.[9]  In this case, Coffman is an executive officer of Target, and her Affidavit establishes that she

was present at the sales meeting where Domineck allegedly threatened Elwakil.  (R. Doc. 41-8, p.

1).  Further, Coffman states in her Affidavit that she was aware of and approved of Elwakil's

termination, *id.* at 3, and Domineck's Affidavit states that Domineck transmitted an email containing

Elwakil's purported resignation to Coffman.  *See* (R. Doc. 41-7, p. 2).

These four paragraphs read:

23.     To the best of my knowledge, at no time did the Plaintiff voice any complaint
concerning Domineck's comment to the Human Resources Department.

24.     To the best of my knowledge, at no time did the Plaintiff follow the
Harassment policy.

26.     To the best of my knowledge, at no time did any other employee present at
the meeting voice a complaint concerning Domineck's comment to the
Human Resources Department.[10]

27.     To the best of my knowledge, at no time did any other employee present at
the meeting follow the Harassment policy concerning any complaint.

(R. Doc. 41-8, pp. 2-3).  Again, the issue is whether the statements are *admissible* evidence.

According to Rule 56, "[s]upporting and opposing affidavits shall be made on personal knowledge."

*Id.*  "A witness may not testify to a matter unless evidence is introduced sufficient to support a

finding that the witness has personal knowledge of the matter."  F.R.E. 602.  *Cf. Randolph v.*

*Terrebonne Parish Consolidated Government*, No. 03-0614, 2003 WL 22836099, at *4-*5 (E.D. La.

Nov. 25, 2003) (Roby, M.J.) (finding that even where affiant manager might have personal

knowledge of a particular event, affiant failed to submit facts indicating that he had personal

---

[9]Target also argues that any issue about the Elwakil's own complaints are moot since Elwakil herself has
admitted that she did not complaint to Human Resources because doing so would have been futile.  *Id.* at 2.

[10]Domineck's "comment" here was the statement that she would strike Elwakil with a roll of paper towels if
Elwakil kept talking.

knowledge that a particular employment action had occurred).

Here, the Coffman Affidavit does not state that Coffman's job duties as Vice President include either review of employee complaints made to Human Resources, or determination of compliance with Target's harassment policies. Therefore, Target has not established that Coffman's job duties would charge her with sufficient "personal knowledge" of the relevant Human Resources files, much less whether these files would or would not contain complaints from the staff meeting. Having not established sufficient personal knowledge for Coffman's statements in Paragraphs 23, 24, 26, and 27, they are inadmissible. Therefore, Elwakil's Motion to Strike on these Paragraphs is granted.

### b.    Exhibit E Papers

The second issue in the instant Motion to Strike concerns Exhibit E of Target's Motion for Summary Judgment. Exhibit E contains four documents pertaining to Domineck's alleged assault of Elwakil: (1) a Kenner Police Department Miscellaneous Report Card dated April 6, 2009 which was issued to Elwakil (R. Doc. 41-9, pp. 1-4); (2) a Kenner Police Department investigation report dated April 6, 2009 which was issued to Elwakil (R. Doc. 41-9, pp. 5-6); (3) a summary of an investigation conducted by the Kenner Police Department dated April 6, 2009 which was issued to Elwakil (R. Doc. 41-9, p. 7); and (4) a document issued by the Clerk of the Mayor's Court of the City of Kenner which lists an entry for Domineck regarding a February 16, 2009 charge on Ticket # 55583 for "DIST THE PEACE; DISORDLY CONDT" (R. Doc. 41-9, p. 8). (R. Doc. 45-1, pp. 1, 4).

In support of her motion, Elwakil argues that the Exhibit E Papers are not authenticated by any affidavit or sworn declaration, and therefore should be stricken. (R. Doc. 45-1, p. 4). Elwakil further argues that this would remain true even if the documents were highly probative to resolution

of summary judgment, or whether the movant might be able to admit the documents at trial by laying the appropriate evidentiary foundation.  *Id.* at 4-5.  Elawkil further argues that the Fifth Circuit has found such admission to constitute an abuse of discretion by the trial court.  *Id.* at 6 (citing *Travland v. Ector County, Texas*, 39 F.3d 319, 1994 WL 612342, at *5 (5th Cir. Oct. 20, 1994) (table, text in Westlaw).

In opposition, Target argues that the documents were part of discovery submitted by Elwakil in this case.  (R. Doc. 47, p. 3).  Target further argues that it has submitted an affidavit from its attorney, Alexandra Mora ("Mora Affidavit") attesting that the Exhibit E Papers "were produced during the course of discovery by Plaintiff and were obtained directly from the Kenner Police Department subject to a records request."  (R. Doc. 47-2, p. 1).[11]

In order for documents to be admissible for purposes of summary judgment, they must be authenticated by an affidavit.  Rule 56(c).  "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  F.R.E. 901(a).[12]  The fact that the document was produced by the opposing party in discovery is not conclusive as to its authenticity.  *See Railroad Management Co., L.L.C. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 219-20 (5th Cir. 2005)

---

[11]The affidavit submitted does not provide any basis for how the affiant *knows* that the records were submitted in connection with a records request.

[12]Documents which require authentication include "public records and reports," which, as illustrated by Rule 901(b), can be substantiated by "evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement . . . in any form, is from the public office where items of this nature are kept."  *Id.* at 901(b)(7).  It is not clear whether all of the documents from Exhibit E are properly classified as "public records" and which are not.  For example, while documents (1), (2), and (3) are police reports which are typically not presumed to be "public records." *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322 (2009) ("police reports generated by law enforcement officials . . . do not qualify as business of public records.").  However, document (4) can properly be classified as a "public record."  Ultimately, the Court need not resolve the issue of whether (1), (2), and (3) are "public records" in a civil case where the complainant filed an initial complaint with the police, because it determines that the there is an alternative means to resolve the authentication issue.

(finding that mere production of a record in discovery, without any of these additional criteria, will not alone satisfy the authentication requirements). However, Fifth Circuit courts have found that a document produced in discovery was properly authenticated where, in addition, the document (1) bore the producing party's signature, (2) the party did not claim that the document was not authentic or that her signature was a forgery, and (3) the party affirmed the truth of the facts contained in the produced record in an opposition to summary judgment. *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 562 (5th Cir. 1998).

Here, the Mora Affidavit states that the documents were obtained pursuant to a "records request" and through "discovery." (R. Doc. 47-2, p. 1). However, the Mora Affidavit does not clearly specify that Mora has personal knowledge of how the documents were actually obtained, because she states that the document was procured in by Elwakil in "discovery," but does not specify which party - Elwakil or Target - specifically requested the records directly from the Kenner Police Department. Therefore, it is an open question whether Elwakil was responsible for both the records request and the discovery responses. If Elwakil was in fact responsible, then from the face of the Mora Affidavit, Mora would lack a basis for personal knowledge of how the documents were obtained.

Target's Motion for Summary Judgment states that Elwakil contacted the police department numerous times, and Elwakil does not deny this. (R. Docs. 41-4, p. 1; 44-1, p. 1). Domineck states in her Affidavit that she was visited by police officers at her workplace on February 23, 2009, and that "the police officer told me that [Elwakil] had called the police department to complain that during the sales meeting I banged on a table and then threatened [Elwakil]." (R. Doc. 41-7, p. 4). Domineck further states that on March 16, 2009, Elwakil and another police officer appeared at Domineck's workplace while she was out. *Id.* Domineck further states that the next day a police

12

officer came to her workplace and issued her a summons.  *Id.*  Elwakil has not moved to strike that summons, which contains Domineck's signature and which Target attached as at R. Doc. 41-7, p. 12.

In contrast to the Summons, none of he documents attached contain the signatures of either Elwakil or Domineck, but signatures of police officers.  It is not known whether documents such as police "report cards" should contain such information, but at present the Court has no means of determining whether the documents, even in the circumstances described, can sufficiently "support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).  Therefore, Elwakil's Motion to Strike the Exhibit E Papers is denied.

### 2.   Defendant's Motion to Strike Portions of the Affidavits of Plaintiff and of Anthony Giusti (R. Doc. 51)

In this Motion, Target seeks an Order from this Court striking portions of two of the Affidavits of Elwakil, as well as the Affidavit of Anthony Giusti ("Giusti Affidavit") (R. Docs.  44-2, 44-3, 44-4), (collectively, "Elwakil and Gusti Affidavits") which Elwakil submitted in support of her opposition to Target's Motion for Summary Judgment.  The motion is unopposed.  The motion was  noticed for submission on September 26, 2012, and set for hearing on the briefs.

In support of its Motion, Target argues that portions of the R. Docs. 44-3 and 44-4 should be struck because both contain identical conclusory statements, i.e., "[p]rior to the February 16, 2009 meeting I personally heard Ms. Domineck make disparaging comments about Arabs." (R. Doc. 51-1, p. 1 (citing R. Docs. 44-3, 44-4)).  Further, Target also argues that Elwakil's Affidavit at R. Doc. 44-2 affirms that "[o]n two or more occasions [Domineck] made remarks in sales meeting about Arabs and Muslims being 'crazy.'" (R. Doc. 44-2, p. 6).  Target alleges that Elwakil provides no other summary judgment evidence substantiating any of these remarks in the Elwakil and Gusti

Affidavits, and that as a result they should be struck from the record.  (R. Doc. 51-1, p. 2).[13]

Target's position is undermined by Elwakil's deposition testimony, which provides both context and specificity for Domineck's statements:

> Q.  So from the time that Toya Domineck became a sales repr to the time she became a manager, how many times did she make remarks to you?
>
> A.  I already said between four and five.
>
> Q.  Okay. And after she became a manager?
>
> A.  This is all together.
>
> Q.  Okay. And if you can tell me as accurately as possible the actual statement that she made of any of those four or five comments?
>
> A.  I cannot say exactly the same statements because there is a language –
>
> Q.  As close as you remember.
>
> A.  Yeah. But as I remember, Arabs and Muslims, they shouldn't be here in the United States. They need to leave the country. And they are crazy. And this is numerous times. The exact sentence, I cannot really say because I'm not an American as language.
>
> Q.  Okay. And was that – you also said comments about Saddam Hussein and Bin Laden?
>
> A.  Yeah, around the times, you know, when Bin Laden been wanted and the problems between Bin Laden and the United States. That was the comments.
>
> Q.  Okay. So I really need to understand exactly what the context was. So tell me like the first time you heard a comment. Where were you standing? Who was nearby? What comment was made?
>
> A.  Okay. I'll be sitting on the table, and Toya would be around Lorna's[14] office. Well, it's not an office. It's like a desk. And I would just hear it' either she is talking straight to me or just making comments to herself or comments to one of the sales reps. I really don't know. But I know a few times I was standing in front of her and we are talking. And I think that is due to watching stuff on TV at night when we get home; and there would be some stuff in the news about Bin Laden. And I think that is maybe why the conversation starts, something about that.

(R. Doc. 41-11, pp. 2-3).

---

[13]The verbiage used by Target on this point is confusing.  Target first describes the Affidavits as R. Docs. 44-3 and 44-4, and states that "Defendant now files this Moition to Strike portions of *those* Affidavits" (R. Doc. 51-1, p. 1). The Motion goes on to describe R. Doc. 44-2, and then state that "[t]hese portions of the witnesses sworn statements should be stricken from the record."  *Id.* at 2.  In conclusion, Target requests that "the portions of the affidavits described herein be struck."  *Id.* at 3.  The Court construes this Motion as covering all three Affidavits, i.e., R. Docs. 44-2, 44-3, and 44-4.

[14]"Lorna" appears to be "Lorna Chapuis" (R. Doc. 41-11, p. 16) who is not otherwise defined in the course of the record.

The issue is whether the Elwakil and Gusti Affidavits are, given this context, are in fact conclusory. Fifth Circuit courts have found that "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 n.6 (5th Cir. 1996) (finding that assertion that "African-American players were referred to and addressed with hostile and profane language whereas white players did not receive such treatment" was held to be vague and conclusory). However, statements for which sufficient contextual evidence has also been presented remain admissible. For example, in *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 990-91, 993 (5th Cir. 2005), an employment discrimination claimant's statements were sufficiently specific when she alleged two specific statements made by hiring manager, "these good old white boys don't want black people touching their cards," and "maybe I've been told not to hire too many blacks on the poker room," as well as testimony that hiring manager occasionally used racial slurs.

In this case, as noted above, Elwakil's affidavit statements may be largely conclusory when excised from context, but they are substantiated by more particular deposition testimony referenced above. Therefore, they need not be stricken from the record. Accordingly, Target's Motion to Strike is denied.

### 3.    Plaintiff's Motion to Strike Exhibits Submitted with Reply Memorandum and Alternatively for Leave to File Surreply (R. Doc. 57)

Finally, Elwakil has also opposed the exhibits submitted with Target's Reply Memorandum due to the fact that they were filed untimely. (R. Doc. 57). Alternatively, Elwakil moves to file a sur-reply. *Id.* The motion is opposed. (R. Doc. 58). The motion was noticed for submission on October 3, 2012, and set for hearing on the briefs.

In support of her motion, Elwakil argues that Target has submitted entirely new exhibits to its Motion for Leave to File a Reply (R. Doc. 48).[15]  Specifically, Elwakil argues that the Affidavit of Karein Heinze, Target's Director of Human Resources ("Heinze Affidavit"), is entirely new, and is being used to support a new argument: that similarly situated employees who were not minorities for the purposes of this matter were terminated during the same general time period.  (R. Doc. 56-3, pp. 2-3).  Elwakil also argues that Target has submitted new deposition testimony excerpts ("New Deposition Excerpts"),[16] and also takes issue with the change in notarization of the re-submitted Coffman Affidavit.[17]  Elwakil further argues that Target's introduction of new evidence sidesteps the normal procedure for summary judgment, and as a result the Court issue one of two Orders: either it may ignore the newly submitted evidence, or grant leave for filing of a sur-reply within a specified deadline.  (R. Doc. 57-2, p. 2).

In opposition, Target argues that Elwakil's own motion in opposition to Target's motion for summary judgment appeared to proffer new arguments, to which Target was obligated to respond. (R. Doc. 58, p. 1).  Specifically, Target argues that in her petition, Elwakil alleged that Target had retaliated against her after she complained about being discriminated against.  *Id.*  However, in her opposition Elwakil argued both retaliation *and* discrimination.  *Id.*  By extension, Target argues that

---

[15]R. Doc. 48 was terminated by the clerk's office as being defective.  Target submitted R. Doc. 51 as a replacement.

[16]Specifically, Elwakil further argues that different portions of the plaintiff's deposition are now submitted with the reply to support different propositions.  *Id.*  Target does not respond to this particular argument in its opposition.  (R. Doc. 58).

[17]Elwakil further argues that although the signature affixed to Coffman's affidavit "appears to the plan eye" to be the identical signature as the previously submitted non-notarized Affidavit discussed above, this new, notarized version is dated January 24, 2012.  *Id.*  Target argues in response that these are in fact the same signature.  (R. Doc. 58, p. 2).  Target argues that this is permissible because in a prior filing Target's attorney already stated that she was present as notary for the signing of the Coffman Affidavit, but had simply forgotten to sign the notary line; therefore, she simply signed as a notary and resubmitted the supplemental Coffman Affidavit discussed above.  *Id.* at 3.

it was obligated to respond to Elwakil's new arguments of stand-alone discrimination with additional evidence. *Id.* Target further argues that even if the Court finds that the Heinze Affidavit introduces new evidence, the majority of Elwakil's memorandum should be struck because only one paragraph of its ten pages is actually devoted to refuting the Heinze Affidavit. *Id.* at 2.

Courts in the Fifth Circuit have found that a court need not consider new arguments raised for the first time in a summary judgment reply brief. *See Doe ex rel. Doe v. Beaumont Independent School District*, 173 F.3d 274, 299 n.13 (5th Cir. 1999) (citing cases). However, a court may consider new evidence introduced in a reply brief if the non-movant is given an adequate opportunity to respond. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004). In exercising discretion to consider new evidence, the circumstances of the case, such as its timing and the existing litigation posture, may be a factor. *See In re e2 Communications, Inc.*, 320 B.R. 849, 860 n.11 (Bankr. N.D. Tex., 2004) (failing to consider new evidence submitted with reply brief, where brief was submitted two days before summary judgment hearing, and Trustee filed a motion to strike the reply).

In this case, both the timing and litigation posture, as well as surrounding circumstances, favor striking the new evidence. Target's Reply was filed on September 6, 2012, one day *after* the underlying summary judgment motion had been noticed for submission. Further, Elwakil has filed a Motion to Strike. Far more importantly, Target's proffered reason for introducing the new evidence - i.e., that it was responding to the "new" arguments raised in Elwakil's opposition - is questionable for several reasons, and does not appear to be a case of excusable oversight.

First, the plain language of Elwakil's Petition alleged that Target violated, *inter alia*, "other statutory or regulatory prohibitions against discrimination *and* harassment *and* retaliation," and that she "filed a *Charge of Discrimination* . . . [with the EEOC] alleging retaliation." (R. Doc. 1-1, ¶¶

17

10, 13) (emphasis added).  Elwakil's EEOC Charge of Discrimination, which Target included in an earlier Motion to Dismiss, indicated that Elwakil has brought her charge under "Race," "Religion," "National Origin," and "Retaliation."  (R. Doc. 7-4, pp. 1-3).  In preserving Elwakil's Title VII claims in disposition of Target's Motion, the Court specifically noted both the retaliation and discrimination elements of her claim.  (R. Doc. 28, p. 7).

Second, Target's own motion for summary judgment states, in the first page, that "Ms. Elwakil alleges that she was subject to unlawful discrimination *and* retaliation" in violation of federal law." (R. Doc. 41-3, p. 1) (emphasis added).[18]  Target's Motion goes on to make arguments for why Elwakil is not entitled to prevail on her discrimination claims,[19] and Target sets forth a legal standard for adjudicating employment discrimination claims on summary judgment, and addresses the issue of Domineck's allegedly discriminatory remarks.  *See* (R. Doc. 41-3, pp. 7-9). Specifically, Target states that despite Elwakil's charges of discrimination, "[d]efendant has proffered a legitimate business reason for the termination - [Elwakil's] resignation had been accepted." *Id.*  at 9.  Therefore, Target's post-hoc argument in R. Doc. 58 that its introduction of new evidence was directed to the "new" claims raised in Elwakil's opposition is not borne out by either the prior arguments Target has made, or the evidence it submitted in support of those arguments.[20]

For these reasons, the Court finds that the circumstances favor striking any "new" evidence

---

[18]Target also argues that "[s]ome of the Plaintiff's allegations are complicated by the fact that she has made contradictory statements in different settings."  (R. Doc. 41-3, p. 1).

[19]Target also argues that although Elwakil has not broached the subject of punitive damages, those damages should be dismissed.

[20]Moreover, although the Court granted Target leave to file the Motion to File a Reply, it did so without reasons and therefore the Court did not specifically endorse Target that it wished to respond to "new" evidence. Indeed, Courts retain discretion, and routinely grant, motions for leave to file reply memorandums in the course of civil litigation.

included in Target's Reply. Accordingly, the Court grants Elwakil's Motion to strike as it pertains to the Heinze Affidavit, as well as New Deposition Excerpts which Target did not originally submit along with its original motion for summary judgment.

The Court has already admitted a revised version of the Coffman Affidavit as contained in R. Doc. 47-1, and to the extent that Elwakil requests that this document be stricken, that requests is denied as moot because as previously stated, the Coffman Affidavit is not "new" evidence, but constitutes a correction based on an understandable oversight, which Target moved in good faith to correct. Finally, because the Court has struck all of Target's "new" evidence, granting Elwakil leave to file a sur-reply is both irrelevant and inappropriate. Elwakil's motion is denied to that effect.

### B.  Target's Motion for Summary Judgment

With the prior motions disposed of, the Court now turns to Target's Motion for Summary Judgment, Elwakil's Motion in Opposition, and Target's Reply.

#### 1.  Standard of Review

Rule 56(a) states that a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if resolving that fact in favor of one party could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Poole v. City of Shreveport*, --- F.3d ----, 2012 WL 3517357, at *3 (5th Cir. Aug. 16, 2012).

"After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citation omitted). Here, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

19

Although "[t]he court must resolve factual controversies in favor of the nonmoving party, . . . the nonmoving party cannot satisfy its burden merely by establishing some metaphysical doubt as to the material facts, by conclusional allegations in the affidavits, or by only a scintilla of evidence." *Armstrong v. K & B Louisiana Corp.*, 2012 WL 3834068, at *2 (5th Cir. Sept. 5, 2012) (citations and internal quotation marks omitted); *see Little*, 37 F.3d at 1075 (same).   In considering a summary judgment motion, the Court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."   Rule 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The Summary judgment standard in an employment discrimination case is premised upon on a burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and its progeny.   Each step of this test will be discussed, as appropriate, below.

### 2.   Analysis

#### a.   Undisputed Facts

Elwakil had been hired by a company called News on Wheels in 1995, where she worked continuously, and eventually obtained the title of Account Executive.   (R. Docs. 41-4, p. 1; 44-1, p. 1).   On June 2007, Target acquired News on Wheels, and Elwakil continued to work at Target after acquisition.   *Id.*   After acquisition, Target gave Elwakil a copy of its written anti-harassment policy, for which Elwakil acknowledged both receipt, as well as her awareness of her "at will" employment status.   *Id.*   The policy excerpt included indicates that Target "prohibits discriminatory practices, including harassment."   (R. Doc. 41-7, p. 11).   The policy excerpt prohibits harassment on the basis of, *inter alia*, race, religion, or national origin, and states that "[a]n employee who believes that he/she or any other employee is the victim of harassment should report any such incident immediately to the Human Resources Director."   *Id.*   Prior to February 1, 2009, Elwakil had

no issues of discrimination, and at not time either before or after February 1, 2009 did she report any discriminatory acts to Target in accordance with Target's harassment policy.   (R. Docs. 41-4, p. 1; 41-11, p. 5; 44-1, p. 1).

On or about February 2, 2009, Elwakil's manager was replaced by a new manager, Toya Domineck ("Domineck").  (R. Docs. 1-1, ¶¶ 5-6; 41-4, p. 1).[21]  On February 16, 2009, an incident took place during a staff meeting in which Domineck, after discussing Elwakil's declining sales numbers, stated that she would physically strike Elwakil if she did not stop talking.[22]  (R. Docs. 41-4, p. 2; 44-1, p. 2).  Coffman, who as previously mentions was a Vice President at Target, was present at the sales meeting, but did not stop Domineck from acting or reprimand her for her actions. (R. Docs. 41-8, p. 2; 44-3, p. 2; 47-1, p. 2).  Elwakil did not report this incident to Target's Human Resources Department.  (R. Doc. 41-11, pp. 5-6).

Elwakil subsequently contacted the Kenner Police Department and requested that the police issue Domineck a citation for these physical threats.  (R. Docs. 41-4, p. 2; 44.1, p. 2).  Elwakil contacted the police on several subsequent occasions, and eventually they issued a summons to Domineck on March 17, 2009 for violation of Kenner City Ordinance No. 1429, Sec. 7-127, i.e., "disturbing the peace" and "threats," although from the summons the date of its issuance is unknown.  (R. Docs. 41-4, p. 2; 41-7, pp. 4-5; 44.1, p. 2)  *Id.*  Coffman was also notified by the police about this incident on March 16, 2009, and explained that Domineck's physical threat was

---

[21]Elwakil occasionally referred to herself in email communications as "QUEEN OF EGYPT and the universe."  (D's SUMF, at 11).

[22]The words used and the tenor of the remark remain disputed by the parties.  For example, Target states that Domineck stated "Wafaa, if you don't know it off, I'm going to bop you on the head with this roll of paper towels."  (R. Doc. 41-7, p. 2).  By contrast, Elwakil states that Domineck said "I don't want to hear these shit excuses about Katrina anymore. You need to shut up, and if you don't know how to shut up I know how to make you shut up," and "[i]f you open you mouth one more time I'm going to bear the shit out of you," before slamming a roll of paper towels down on the table in front of Elwakil.  (R. Doc. 44-2, p. 4).  However, the parties do not dispute that Domineck in fact indicated that she would physically strike the Plaintiff in some manner.

21

better characterized as a joke.  (R. Doc. 41-8, pp. 2-3).  Elwakil's last day of employment was February 23, 2009. (R. Docs. 1-1, ¶ 9; 41-4, p. 2).

### b.   <u>Burden Shifting</u>

When considering a summary judgment motion in a Title VII case, the Court must first determine if the plaintiff has established a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002).[23]  (finding that in Title VII actions, a prima facie standard is used for evidentiary purposes on summary judgment); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986) ("The *McDonnell-Douglas* formula . . . is applicable . . . in a . . . summary judgment situation.").

"Establishment of a *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citing *Burdine*).  However, the burden-shifting standard in *McDonnell* was explicitly qualified, as the Court stated that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to different factual situations."  *McDonnell*, 411 U.S. at 802 n.13. Therefore, each of Elwakil's claims must be individually evaluated to ascertain its relevance.

### ii.   **Application to Elwakil's Claims**

### (1)   **Discrimination**

The first issue is whether Elwakil has met her burden of proving a *prima facie* case sufficient

---

[23] Admittedly, *Swierkiewicz* has been widely distinguished by other circuits in the wake of *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  However, the Fifth Circuit has not yet joined these other circuits in distinguishing or otherwise limiting the holding of *Swierkiewicz*.

to raise an inference of discrimination for purposes of summary judgment.[24]  Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff alleging discrimination must show, by preponderance of the evidence, that: (1) she is a member of a protected class; (2) she was qualified for her position, (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee who is not a member of her protected class.  *McDonnell-Douglas*, 411 U.S. at 802.  "The prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case."  *Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (citations omitted).

Here, as to (1), Elwakil has alleged discrimination because of a hostile work environment and disparate treatment on three grounds: her race (Arab), her nationality (Egyptian), and her religion (Muslim).  (R. Doc. 1-1, ¶ 6).[25]  Neither party disputes that Elwakil is not a member of a protected class with respect to any of these classifications.[26]

The dispute in this case centers on (2), (3), and (4) of the *McDonnell Douglas* factors.  As to (2) neither party suggests that Elwakil was not, at least at one time, qualified for her position, as

---

[24]Admittedly, the Court previously found that Elwakil met this burden in connection with Target's 12(b)(6) Motion to Dismiss.  *See* (R. Doc. 28).  However, because the Court applies a different standard on Summary Judgment, the evidence should be considered anew.

[25]Earlier in the proceedings, when considering Target's Motion to Dismiss, the Court liberally construed Elwakil's claims as ones for disparate treatment and a hostile work environment.  *Elwakil v. Target Media Partners Operating Co., LLC*, 2012 WL 669068, at *4 (E.D. La. Feb. 29, 2012).  Nothing in the parties' filings has changed that outcome.

[26]To the extent any disagreement remains, federal courts have found "Arab" classified as "race" and "Egyptian" under "nationality." *See Youssef v. F.B.I.*, 687 F.3d 397 (D.C. Cir. 2012) (Egyptian); *Sain Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (Arab, in the context of claim brought under 42 U.S.C. § 1981).

Elwakil had been employed continuously since 1995, and had won sales competitions.  (R. Doc. 44-3, p. 2).  Instead, Target argues that Elwakil was "resistant" to changes made once Target acquired News on Wheels, although it does not specify what types of changes she objected to.  (R. Doc. 41-3, p. 2).  In opposition, Elwakil has argued despite her long tenure and demonstrated sales success, she had experienced a downturn in her number of clients in the wake of Hurricane Katrina, from approximately 60 to 23.  *See* (R. Doc. 44, p. 3; Ex. B).

Here, Elwakil admits that her sales figures had decreased.  *See* (R. Doc. 44-2, pp. 2-3).  However, Target has not specifically argued that this decrease was unacceptable or given any parameters as to what an acceptable range of clients would have been.   Therefore, construing reasonable doubts and inferences in Elwakil's favor the Court finds that for purposes of summary judgment the evidence suffices to establish Elwakil's establishment of prong (2) of her *prima facie* case.

As to (3), for purposes of the Title VII discrimination claim, "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007); *Turner v. Novartis Pharaceuticals*, 2011 WL 901022, at *5 (E.D. La. Mar. 11, 2011) (Roby, M.J.).[27]

The issue is whether Elwakil's separation from Target is or is not properly construed as a "discharge" for purposes of establishing a *prima facie* case.  Elwakil and Target clearly dispute whether Elwakil resigned voluntarily, resigned under duress, or had her employment terminated.

---

[27]Moreover, in the absence of an actual discharge an employee can still prove "constructive" discharge, which occurs when "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Cortes v. Masux Exploration Co.*, 977 F.2d 195, 200 (internal quotation marks omitted).  "[A] constructive discharge claim requires a greater severity or pervasiveness or harassment than the minimum required to prove a hostile work environment."  *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).  In this case because a genuine issue of disputed material fact exists as to whether Elwakil was actually discharged, there is no reason to reach the "constructive" discharge argument.

Affidavits submitted by Elwakil and Target dispute this proposition, as do emails submitted by Target purportedly "confirming" that Elwakil resigned voluntarily. *Compare* (R. Doc. 41-7, pp. 1-2, 7-8), *with* (R. Doc. 44-2, p. 2).

Further, the emails submitted by Target in support of its position only add ambiguity. The first of these emails was sent from Domineck to Coffman on February 11, 2009, at 11:42 a.m. and forwarded again from Coffman to Karen Heinze[28] on February 18, 2009 at 1:42 p.m. The email, with the subject line "wafaa," reads "__st resigned....!! _ my opinion...Great News!!! She Could Not move forward and it was becoming increasingly frustrating for me and she knew it!!! (R. Doc. 41-7, p. 8) (all punctuation and grammar in original). First, because the document is cropped at the edges, it is unclear who Domineck is referring to when she states "_st resigned....!!!" Second, it is unclear why Coffman would have waited an entire week - and two days after the February 16, 2009 staff meeting  - to forward this employment-related email.

Another string of emails, forwarded by Domineck to Heinze on February 20, 2009 at 12:42 p.m. and containing communications between Domineck and Elwakil between February 11, 2009 at 1:42 p.m. and February 12, 2009 at 12:51 p.m., also fail to sufficiently establish Elwakil's "resignation:"[29]

> *Elwakil*: i will be going on vacation for one week on feb 25 2009.
> *Domineck*: This is not approved Wafaa....you gave your 2 weeks notice of resignation....why would you be turning in a 1 week vacation request. I'm confused.
> *Elwakil*: when did i give my 2 weeks resignation???
> *Domineck*: Don't play games with me Wafaa!!
> *Elwakil*: i'm serious ,I'm not.
> *Domineck*: I've already distributed your accounts to the reps!!!

---

[28]Although Heinze is identified as Target's Human Resources Director in the Heinze Affidavit, because the Heinze Affidavit has been stricken from the record the details of her position can have no bearing on determination of the instant motion.

[29]With the exception of the first email, which was transmitted on February 11, 2012.

*Elwakil*: well i was not awar of ALL OF THAT , WHEN THIS HAPPENED

(R. Doc. 41-7, pp. 9-10) (all punctuation and grammar in original).  It is thoroughly unclear from this dialogue that Elwakil had in fact submitted a notice of resignation prior to the time her employment from Target was terminated.  Therefore, for purposes of establishing a *prima facie* case, Elwakil's discharge claim survives.

With respect to (4), since Elwakil does not allege that she was *replaced* by a similarly qualified person who is not a member of her group or groups, she must prove "disparate treatment" - i.e., that similarly situated employees were more favorably treated.  *Johnson v. Louisiana*, 351 F.3d 616, 621 (5th Cir. 2003).  "The burden of establishing a prima facie case of disparate treatment is not onerous."  *Burdine*, 450 U.S. at 253.  "To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently."  *Wheeler v. BL Development Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (citation omitted).  *See also McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).

Elwakil makes several arguments in support of her disparate treatment claim.  First, she states in an affidavit that she was treated differently from all other Account Executives because unlike the other Executives she was not granted computer access from home to the office computer. (R. Doc. 44-2, p. 6).  This substantiates Elwakil's allegation in the Complaint that she "was required to perform work which other employees either were not required to perform or were not required to perform to the same level of time and effort, including computer input, design, and layout."  (R. Doc. 1-1, ¶ 8).[30]  More specifically, affidavits and depositions already analyzed point to a dispute

---

[30]Elwakil does not state that these other account managers were or were not members of one or several of Elwakil's protected classes.  Nevertheless, she also states that "at the time . . . she was harassed and later terminated as an Egyptian, Arab, Muslim, no fellow salespersons who were not members of one or more of these minority groups were subjected to the same nature of disparaging comments or physical threats."  (R. Doc. 44-3, p. 1).

as to whether Domineck did or did not make remarks about Arabs and Muslims being "crazy," that similarly situated non-arab, non-Egyptian, non-Muslim employees were not treated this way. *See* (R. Docs. 44-2, p. 6; 44-4, p. 2). Elwakil's arguments of discrimination are sufficiently particular to satisfy the non-onerous *prima facie* standard for purposes of disparate treatment.

Because Elwakil has proven a *prima facie* case of discrimination, the burden should now shift to Target to show that "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell*, 411 U.S. at 802. To do so, the employer must produce *admissible* evidence which would "support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

Here, analysis of Target's position is simple because there is nothing to analyze: Target has argued that Elwakil resigned, and was not terminated. Because a question of fact clearly exists regarding whether she was or was not terminated, Elwakil should not lose the presumption of discrimination. The employer, as the non-mover, is not entitled to the reasonable doubt of the dispute between that fact. For this reason, the analysis of Elwakil's discrimination claim need not proceed past the *prima facie* level. As such, Target's motion for summary judgment is denied.

### (2)   Hostile Work Environment - Race and Religion

The next issue is whether Elwakil can successfully prove a *prima facie* case with respect to her hostile work environment claims on race, religion, or national origin. Specifically, Elwakil has testified that Domineck made denigrating statements about arabs, including "at least two" occasions in early February 2009. *See* (R. Doc. 44-2). Moreover, Elwakil was confronted in a staff meeting with actions from a supervisor that did in fact result in criminal proceedings and a finding of guilt,

and in reaction to which a company Vice President did not intervene.[31]

Elwakil's affidavit states that after being confronted with low sales numbers at the February 16, 2009 meeting, and after Elwakil attempted to explain her low sales as stemming from Hurricane Katrina, Domineck said "I don't want to hear these shit excuses about Katrina anymore. You need to shut up, and if you don't know how to shut up I know how to make you shut up." Elwakil further states that a few moments later, Domineck told her that "[i]f you open your mouth one more time I'm going to beat the shit out of you." (R. Doc. 44-2, pp. 3-4). According to Elwakil, Domineck then took the roll of paper towels and "slammed the roll of paper towels down on the table in front of me." *Id.* at 4. Elwakil then argues that Domineck's supervisor, Linda Coffman, was in the room but did not act to restrain Domineck. *Id.*; (R. Doc. 47-1, p. 2).[32]

Although Elwakil has already established her claim for disparate treatment in connection with her wrongful discharge claim, the test for whether a hostile work environment exists is more stringent. Here, a plaintiff must allege "(1) [racially] discriminatory intimidation, ridicule and insults which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment and (4) create an abusive working environment." *DeAngelis v. El Paso Municipal Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995) (finding that four printed derogatory references directed specifically at plaintiff at irregular intervals over two and a half years did not constitute sufficient

---

[31]Elwakil also testified at her deposition that "I was harassed that day when Linda Coffman she walked in the meeting in the morning and she asked me to get up and give her a hug and a kiss. And when I was forced to do that - and I was forced to do it because I don't want to do it." (R. Doc. 44-11). Elwakil does not argue that she ever complained to Human Resources about this issue, and argues that it would be futile because Coffman was a "manager's manager," and therefore complaining would be futile. She has not offered any further evidence of this claim on summary judgment.

[32]In her Affidavit, Domineck states that she was not aware of "any criminal complaint" at the time Elwakil's employment was terminated. (R. Doc. 41-7, p. 5). Domineck also states that "[t]he misdemeanor summons was not written until March 17, 2009, almost one month aller [sic] the Plaintiff's termination on February 23, 2009." *Id.*

hostility as a matter of law); *Cavalier v. Clearlake Rehabilitation Hospital, Inc.*, 2008 WL 2047997, at *4-*5 (S.D. Tex. May 12, 2008) (extending *DeAngelis* hostile work environment test to case involving allegations of racial discrimination).  Additionally, in the employer must (5) know or have reason to know about the discrimination.  *Jones v. Flagship International*, 793 F.2d 714, 721 (5th Cir. 1986).

"In suits involving disparate treatment . . . the accusation is that the employer simply treats some people less favorably than others because of their race . . . religion . . . or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).  The conduct complained of must be either severe *or* pervasive, but need not be both.  *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434-35 (5th Cir. 2005).

Courts have cautioned that "The mere utterance of an . . . epithet which engenders offensive feelings is not enough" to establish a hostile work environment.  *Harris*, 510 U.S. at 23.  "A recurring point in [Title VII] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.*  (internal quotation marks omitted).

*See also DeAngelis*, 51 F.3d at 594 (finding that specific attempts to target the plaintiff with boorish, chauvinistic language were set in the context of an attempt at "humor").

Courts in the Fifth Circuit have found that hostile work environment claims must be constant and pervasive, and isolated incidents do not qualify. *See, e.g.*, *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644 (5th Cir. 2012) (finding no hostile work environment where, over ten-year period, employee was called a racially derogatory term on one occasion and saw a poster or letter derogatory towards hispanics on another); *Jones v. Continental Cuisine, Inc.*, 353 F. Supp. 2d 716, 720 (E.D. La. 2004) (finding no hostile work environment from one use of the tern "N___").  In sum, "[w]hile a single or an isolated incident can give rise to [a] . . . claim if it is severe enough, these claims are rare and usually involve physical violence."  *Melson v. Chetofield*, No. 08-3683, 2009 WL 537457, at *4 (E.D. La. Mar. 4, 2009) (Vance, J.).

Even a series of utterances, without more, is unlikely to qualify as a hostile work environment. *Cuthbertson v. American Federation of Government Employees*, 2012 WL 4321742, at *3 (N.D. Tex. Sept. 21, 2012) (finding that three statements in which employee's mentor referred to him as a "young white boy," that he had only gotten his job "because [he is] white," and that one "can't trust a white committee because the white guys are always out to steal money from the local" were insufficient to demonstrate a hostile work environment).  Instead, courts have found hostile work environment claims to occur where the conduct is either continuous, or coupled with clear alternate indicia of discrimination. *See, e.g.*, *Jackson v. Wilson Welding Service, Inc.*, 2012 WL 12807, at *5-*6 (Jan. 4, 2012) (finding that where African-American employees who worked for company over approximately two-month period were, *inter alia*, called "boy," overheard their coworkers using the "N___" word, telling racially charged jokes, wearing confederate flags almost every day, and failing to remove racist graffiti from workplace, and were provided with substandard

30

sleeping quarters, were sufficient to create a hostile work environment); *Jones v. Delta Towing LLC*, 512 F. Supp. 2d 479, 487-88 (E.D. La. 2007) (finding hostile work environment where plaintiff alleged that, *inter alia*, over six month time period, supervisor and coworker used the term "N___" whenever plaintiff was in the room, and plaintiff was told a story about the drowning death of a black man while out at sea).

Affording Elwakil the benefit of the doubt as to all reasonable inferences, her allegations fall between the two parameters delineating hostility and the lack thereof.  Elwakil's deposition testimony indicates that between June 23, 2008 and February 23, 2009 Domineck made "between four and five" statements which were derogatory towards Elwakil.  (R. Doc. 41-11, p. 2); *see* (R. Doc. 41-7, p. 1).  In her affidavit, she states that "[o]n two or more occasions she made remarks in sales meetings about Arabs and Muslims being 'crazy.'"  (R. Doc. 44-2, p. 6).  Moreover, Elwakil admitted that prior to February 1, 2009, she had "no issues of discrimination."  (R. Doc. 41-4, p.1; R. Doc. 44-1, p. 1).  Elwakil does not recall the precise context, or words used, but states that "as I remember, Arabs and Muslims, they shouldn't be here in the United States. They need to leave the country. And they are crazy."  (R. Doc. 44-11, p. 2).

Domineck's alleged comments about Arabs being "crazy," as well as her actions at the staff meeting, would, if true, clearly offend common decency.  Moreover, because a hostile work environment inquiry is always context-specific, it is an open question whether five statements similar to those which Elwakil argues existed here, uttered in a group setting, could in other cases rise to a level of discriminatory intimidation which altered the conditions of Elwakil's employment and created an abusive working environment.

The final issue is then whether Target knew or had reason to know of the discriminatory conduct, and failed to take corrective action.  Notification typically involves submission of a

complaint to Human Resources, or to some other director.  *See Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 299-300 & n.3 (5th Cir. 2001) (finding that, in sexual harassment case brought under Title VII, employer "cannot be held liable for conduct of which it had no knowledge."); *Moore v. United Parcel Service, Inc.*, 150 Fed. App'x 315, 319 (5th Cir. 2005) (finding that, *inter alia*, where supervisor did not have termination authority and employee failed to complain of discriminatory conduct to another supervisor at the same level, employee was still obligated to follow company complaint policy).  Other courts have found that on summary judgment, a fact issue can occur as to a company's knowledge when a company executive was likely to have overhead several of the allegedly discriminatory comments.  *See Notaro v. Fossil Industries, Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y. 2011).

However, in other Title VII cases when the individual alleged to have harassed the individual has supervisory authority over the individual, the employee need not show that she followed company policy by complaining about the conduct.  *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999) (finding that when supervisor had immediate or successively higher authority over plaintiff-employee, employee's failure to notify human resource department of complaints need not occur); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001) (noting that *Faragher* eliminated reporting requirement in race-based Title VII claims, and finding that district court's decision predated *Faragher*); *Reine v. Honeywell Intern., Inc.*, 362 Fed. App'x 395, 397 (5th Cir. 2010) (finding that the fifth prong of the test need not be shown when "a supervisor" is alleged to have engaged in the harassment).

Here, by Elwakil's own admission, she acknowledged receipt of Target's employee manual, including its discrimination policy. (R. Doc. 41-4, p. 1; 44-1, p. 1).  Although she never complained to Human Resources regarding Domineck's conduct at the staff meeting or her derogatory

comments, she stated that making a complaint was impossible because both Domineck and her manager, Coffman, were clearly conspiring against her.   (R. Docs 44-1, p. 1;. 41-11, p. 2). Moreover, neither party has introduced evidence that Elwakil in fact had another manager at target to whom she could voice her complaints.   Because Domineck was Elwakil's direct supervisor, Coffman's actions at the February 16, 2009 staff meeting, or the lack thereof, are irrelevant as to the question of whether Target had "notice" of Domineck's alleged conduct.   Elwakil has successfully proven her *prima facie* case.

Now that Elwakil has proven her *prima facie* case, the burden shifts back to Target to prove that it has a non-discriminatory reason for the actions it took.

Target argues that this conduct is not sufficient to create a hostile work environment within the purview of Title VII because Elwakil has not proven conduct which is objectively offensive. (R. Doc. 41-3, pp. 9-10).   Here, Target focuses on comments Domineck made regarding Arabs and Muslims, and the fact that the references were of an occasional, and not pervasive, nature.   *Id.* at 10. Moreover, even accepting Elwakil's characterization of Domineck's conduct at the February 16, 2009 staff meeting as true, there is no indication that Domineck's heated, profanity-laced comments ever referenced Elwakil's status as a member of a protected group or focused on anything other than Elwakil's sales performance.   Indeed, Elwakil's sales, by Elwakil's own admission, had remained low for a period of time.   Therefore, Target has alleged sufficient facts to rebut the presumption of discrimination.

The burden now shifts back to Elwakil to introduce evidence to create a genuine issue of material fact to preserve her claim.   Elwakil argues that the comments made by Domineck, when conjoined with the physical threat, suffice to establish her hostile work environment claim.   (R. Doc. 44, p. 7).   Two recent Fifth Circuit decisions have suggested that where an employee has acted,

threatened, or insinuated physical violence, that employee's history of bigoted statements can play a role in determining whether a hostile work environment is present.  *See Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 654 (5th Cir. 2012); *Lee v. Regional Nutrition Assistance, Inc.*, 471 Fed. App'x 310, 311 (5th Cir. 2012) (citing *Hernandez*, and finding that employee failed to demonstrate hostile work environment where two racially charged comments, coupled with coworker's drawing of tombstone with employee's name on it, did not constitute hostile work environment in part because there was "no indication the drawing was related to her race nor does she allege the coworker who made the comment also drew the tombstone.") (emphasis added).

Therefore, assuming that Domineck's comments at the staff meeting are as violent Elwakil describes them, The undisputed facts could still indicate the presence of a "hostile work environment" under Title VII, if in fact Elwakil can demonstrate at trial that Domineck's statements were pervasive.  By extension, summary judgment in favor of Target is denied on this claim.

### (3)      Retaliation

### (A)      Filing of Police Reports

Elwakil's Complaint alleges that Target engaged in "retaliation for complaints of invidious discrimination and/or harassment."  (R. Doc. 1-1, ¶ 13).  Elwakil argues that she "has not been able to locate a case on point in which reporting conduct that is both a Title VII violation and a crime to the police was considered."  (R. Doc. 44-1, p. 9).  However, she argues that prior to her February 23, 2009 discharge, the police did in fact come to Target's place of business looking for Domineck. *Id.* at pp. 9-10.  According to Domineck's Affidavit, this occurred on Friday, February 20, 2009. (R. Doc. 41-7, p. 3)..[33]

---

[33]Although the report contained in R. Doc. 41-9 is dated from March 16, 2009, several weeks after Elwakil's last day at Target, it contains a fragmentary entry that on February 20, 2009 Elwakil had called the police regarding the sales meeting incident.  *Id.*  February 20, 2009 was three days before her last day at Target.  *Id.*

In support of its motion for summary judgment, Target argues that Elwakil's retaliation claims should be dismissed because (1) it is unclear what protected activity Elwakil was engaged in, (2) it is unclear what adverse employment action occurred, and (3) it would be impossible for Elwakil to prove a causal link between (1) and (2) because the timing of events place Target's "retaliation" before the adverse activity, i.e., filing an EEOC Charge of Discrimination.   (R. Doc. 41-3, p. 15).

In opposition, Elwakil states that she has met her *prima facie* burden in this case because she engaged in a protected activity, i.e., contacting the police regarding her supervisor's unlawful conduct at the February 6, 2009 sales meeting.  (R. Doc. 44, p. 9).  She further argues that the adverse employment action in this case is the termination of her employment, which occurred on February 23, 2009. *Id.*  Third, she argues that the causal link between the two can be seen through the fact that the police "are not in the habit of tracking whether a person is still employed at a business unless that person's employment is a matter of interest to the police, such as if the person had made a complaint against the supervisor for assault." *Id.* at pp. 9-10.  Fourth, she argues that the timing between the police visit to Target's office on February 20, 2009 (R. Doc. 41-7, p. 3), and her employment termination date on February 23, 2009 (R. Doc. 41-4, p. 2), suggests that causation exists. *Id.*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  In order to state a claim for retaliation, a plaintiff must allege (1) she was engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Hernandez*, 641 F.3d at 118; *see McCoy v.*

35

*City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007) (same).  For purposes of Title VII retaliation claims, "protected activities" include (1) opposition of any unlawful employment practice; or, in connection with a Title VII proceeding, (2) making "a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e–3(a); *Douglas v. DynDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998).

As to (1), the Fifth Circuit has found that not all "opposition" activity is protected, but must be reasonable under the circumstances, which in turn involves balancing the company's interest against the employee's interests in airing grievances.  *Jeffries v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (finding that employee did not comply with stated company policies for airing grievances).  Indeed, other courts have drawn a distinction between general reporting of criminal conduct in the workplace, and reporting criminal conduct which also fell under the rubric of Title VII.  *See Bryce v. West*, 2006 WL 2413971, at *3 (S.D. Tex. Aug. 18, 2006) (citing cases) (finding no Title VII complaint where plaintiff alleged that coworker had picked up a pistol, shot it in the air, and then said that she would feel better [if] she could shoot plaintiff and put the pistol to plaintiff's chest, and other coworkers, referring to plaintiff, were overhead saying "that Mexican does not know what she is doing.").

Other courts have found that filing criminal charges can qualify for Title VII relief if the criminal charge is "the culmination of discriminatory acts," which the victim reasonably believes are the result of his or her status in a protected group.  *See, e.g.*, *E.E.O.C. v. Dinuba Medical Clinic*, 222 F.3d 580, 586 (9th Cir. 2000) (finding that plaintiff reasonably believed that physical assault was based on victim's gender); *cf. Ancheril v. Department of Mental Retardation*, 342 Fed. App'x 659, (2d Cir. 2009) (finding that plaintiff alleging Title VII retaliation claims must have a "good faith, reasonable belief that by filing police complaints, [the plaintiff] was opposing an employment

practice made unlawful by Title VII.") (brackets omitted).  Other courts have found that regardless of "culmination of reasonable belief," filing of a complaint with the police can qualify as "opposition" for purposes of Title VII when the criminal conduct complained would by itself plainly violates applicable Title VII provisions.  *Worth v. Tyler*, 276 F.3d 249, 265 (7 th Cir. 2001) (finding that criminal complaint involving allegation that coworker touched coworker's breast satisfied "opposition.").

On summary judgment the evidence before the Court indicates that although police reports were filed, the contents of certain documents purporting to be "police reports" in the Exhibit E Papers are not appropriately considered.[34]   It is certainly possible that Elwakil mentioned discrimination in the body of these Reports; even if she did not, the Court has already noted that Domineck's comments could be proven to provide a pervasive pattern of discrimination, for which her conduct at the February 2009 sales meeting was the *coup de grace*.  Therefore, Elwakil has met her *prima facie* burden as to (1).

As to (2), the "adverse employment action" is clearly the "termination" of Elwakil's employment, which would be "materially adverse" for purposes of Title VII.  *See Harrison v. Corrections Corporation of America*, 476 Fed. App'x 40, 45 (5th Cir. 2012); *Kent v. Vicksburg Healthcare, LLC*, 2012 WL 1556511, at *12 (S.D. Miss. Apr. 30, 2012) ("[D]ismissal is obviously an adverse employment action.").  Because the Court has already established that there is a genuine dispute of material fact as to whether Elwakil was terminated or resigned, the evidence clearly suffices to establish Elwakil's *prima facie* case of retaliation as to this prong.

As to (3), the causal connection between the protected activity and the adverse employment

---

[34]Again, because the Exhibit E Documents have been excluded, the Court has no grounds to consider the contents of the Exhibit E Documents to determine whether Elwakil did, or did not, mention discrimination therein.

action, Fifth Circuit courts have held that "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. General Services Administration*, 110 F.3d 1180, 1188 (5th Cir. 1997); *Roberts v. Unitrin Specialty Lines Insurance Co.*, 405 Fed. App'x 874, 879-80 (5th Cir. 2010) (noting that "several-month spans between alleged protected activities and . . . termination negate any argument that a causal connection exist[s] between the activities and the termination.").

Here, the sales meeting incident occurred on February 16, 2009, the police appeared at Target's place of business seeking to question Domineck regarding the meeting on February 20, 2009, and Elwakil's employment was terminated on February 23, 2009. These events occurred in close proximity to the email exchange between Elwakil and Domineck between February 11-12, 2009, in which the two women dispute whether Elwakil had or had not resigned. Therefore, the proximity in time between the events leads the Court to conclude that a causal connection exists for purposes of Elwakil's *prima facie* case.

As above, the burden now shifts to Target to demonstrate that its decision was not based on retaliation. However, as with Target's discrimination claim, there is nothing to analyze because Target's central premise - that it did not terminate Elwakil - is still a matter of dispute. Therefore, Target's motion for summary judgment on the issue of retaliation arising in connection with her police report is denied.

### (B)      Filing of EEOC Complaint

Target also argues that Elwakil cannot recover for any retaliation claims filed in connection with her EEOC Letter of Discrimination because she filed the same after her employment was terminated. (R. Doc. 41-3, p. 17). In opposition, Elwakil argues that "the timing is not so clear" because prior to Elwakil's termination, a police officer came into Target's office looking for

38

Domineck.  (R. Doc. 44, pp. 9-10).  Elwakil does not specifically mention the impact which her filing of the EEOC Charge of Discrimination had on her retaliation claim.

When filing her Charge of Discrimination with the EEOC, Elwakil checked a box marked "retaliation."  (R. Doc. 7-4, p. 3).  To the extent that Elwakil's Title VII retaliation claims stem from the filing of her EEOC Charge of Discrimination, Elwakil's claims also fail to meet the *prima facie* standard.  Elwakil filed her EEOC Charge on October 20, 2009, which is after her employment at Target was terminated.  *Id.*  Although her EEOC Charge lists the "discrimination" as occurring between February 1, 2009 and February 23, 2009, there is no indication that she even threatened to file a charge during the course of her employment, and in fact her deposition testimony indicates that she never complained.  (R. Doc. 44-11, pp. 3-6).  As a matter of common sense, Target could not have "retaliated" against Elwakil for actions she had not previously taken.  *See Castlino v. Thomas*, 141 Fed. App'x 255 2005 WL 1578412, at *2 (5th Cir. July 6, 2005) (Table, text in Westlaw) (finding that retaliation charge had no merit when plaintiff claimed retaliation based on filing of EEOC charge, but EEOC charge was filed after plaintiff's employment was terminated). Accordingly, Target's Motion for Summary Judgment is granted on this claim.

### (4)   Punitive Damages

Finally, Target argues that Elwakil is not entitled to punitive damages for her claims because to be found liable, Target's agent must act (1) in a managerial capacity, (2) within the scope of her employment, and (3) with malice or reckless indifference toward the federally protected rights of the plaintiff.  *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535-37 (1991).  To make out a punitive damages claim, a plaintiff must show either retaliation or disparate impact.  *E.E.O.C. v. Premier Operator Services, Inc.*, 75 F. Supp. 2d 550, 562-63 (N.D. Tex. 1999).  Since Elwakil's claims on both counts survive, the Court must evaluate whether any punitive damages claim can

survive.

Elwakil argues in her opposition that she had neither calculated nor sought punitive damages at the date she filed her opposition.  (R. Doc. 44, p. 10).  However, she did request in her original petition "[a]ny other damages that may be shown at the trial of the merits."  (R. Doc. 101, p. 4).  In support of her argument for punitive damages, Elwakil argues that Target failed to act in good faith given that Coffman was present at the sales meeting and failed to intervene in a course of conduct for which another Target employee was eventually found criminally liable.  *Id.*

Under 42 U.S.C. § 1981a(a)(1), punitive damages are available to Title VII plaintiffs.  "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."  *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999).  Even here, "intentional discrimination may not meet this standard where the employer is unaware of the relevant provision or discriminates with the distinct belief that its discrimination is lawful."  *E.E.O.C. v. Stocks, Inc.*, 228 Fed. App'x 429, 431 (5th Cir. 2007) (citing *Kolstad*, 527 U.S. at 537).  "Not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference.  Nor is there a useful litmus for marking the point at which proof of violation sufficient to impose liability becomes sufficient to also support a finding of malice or reckless indifference."  *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000).  However, because the availability of punitive damages is a statutory creation, the failure of plaintiffs to recover non-nominal compensatory damages does not divest their entitlement of punitive damages.  *See Abner v. Kansas City Southern R. Co.*, 513 F.3d 154, 158 (5th Cir. 2008) (finding punitive damages applicable to hostile work environment claim).

Given this indeterminacy, the Fifth Circuit has not established whether the mere fact that a company knew or had reason to know of a Title VII violation exposes that company to punitive

damage liability.  *See Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 807-08 (5th Cir. 1996) (finding that even where employee provided human resources director with complaints of sexual harassment, and director failed to act for six months, award of punitive damages was not warranted); *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 187-88 (5th Cir. 2012) (overturning district court's judgment as a matter of law on punitive damages arising in connection with hostile work environment claim even where company had notice of conduct and failed to take prompt remedial action).

However, other courts have found punitive damages applicable under a variety of circumstances.  *See Stocks, Inc.*, 228 Fed. App'x at 432 * n.7 (finding that, in retaliation case, jury was entitled to punitive damages instruction in case involving extortionate threat of bringing sexual harassment claim in exchange for helping coworker obtain better treatment from company); *Arbaugh v. Y & H Corp.*, 444 F. Supp. 2d 693, 696 (E.D. La. 2006) (finding that in sexual harassment case where criminal battery charge arising from alleged sexual harassment had been dismissed, punitive damages award could stand where circumstances indicated that defendant restaurant owner still knew he was acting in violation of federal law).  *Cf. Lincoln v. Case*, 340 F.3d 283, 291-92 (5th Cir. 2003) (citing *Kolstad* and finding, in fair housing context, that punitive damages were warranted where experienced landlord actively misrepresented availability of housing to tenant).

In this case, the Court indicated at the pretrial conference that it was disinclined to award punitive damages in this case.  However, upon further review the Court finds that under the permissive standard of *Hardin* that the unsettled state of the facts, and the permissive interpretation given to disputed facts at the summary judgment stage, cannot preclude an award of punitive damages as a matter of law.  Accordingly, summary judgment on Target's request for denial of Elwakil's punitive damages claims is denied.

### III.    <u>Conclusion</u>

Acordingly,

**IT IS ORDERED** that Plaintiff, Wafaa Elwakil's, ("Elwakil") **Motion to Strike Exhibits and Affidavit Submitted by Target Media Partners Operating Company, LLC (R. Doc. 45)** is **GRANTED IN PART** and **DENIED IN PART**.

It is **DENIED** as to striking in its entirety the Affidavit of Linda Coffman, attached to Target's Motion for Summary Judgment (R. Doc. 41-8), and as re-attached to Target's Memorandum in Opposition to Plaintiff's Motion to Strike Linda Coffman's Affidavit and Kenner Police Department Records (R. Doc. 47-1).

It is **GRANTED** as to striking Paragraphs 23, 24, 26, 27, and 44 of the Affidavit of Linda Coffman, attached to Target's Motion for Summary Judgment (R. Doc. 41-8), and as re-attached to Target's Memorandum in Opposition to Plaintiff's Motion to Strike Linda Coffman's Affidavit and Kenner Police Department Records (R. Doc. 47-1).

It is **GRANTED** as to striking the Exhibit E Papers, as attached to Motion for Summary Judgment (R. Doc. 41-9).

**IT IS FURTHER ORDERED** that Defendant, Target Media Partners Operating Company, LLC's, ("Target") **Defendant's Motion to Strike Portions of the Affidavits of Plaintiff and of Anthony Giusti (R. Doc. 51)** is **DENIED**.

**IT IS FURTHER ORDERED** that Elwakil's **Motion to Strike Exhibits Submitted with Reply Memorandum and Alternatively for Leave to File Surreply (R. Doc. 57)** is **GRANTED IN PART**, **DENIED IN PART**, and **DENIED AS MOOT IN PART**.

It is **GRANTED** as to striking the Affidavit of Karen Heinze, as attached to Target's Reply to Elwakin's Opposition to Target's Motion for Summary Judgment (R. Doc. 56-3).

It is **GRANTED** as to striking the excerpts of the deposition of Wafaa Elwakil, as attached to Target's Reply to Elwakin's Opposition to Target's Motion for Summary Judgment (R. Doc. 56-1).

It is **DENIED** as to Elwakil's request for permission to file a sur-reply.

It is **DENIED AS MOOT** as to striking in its entirety the Affidavit of Linda Coffman, attached to Target's Motion for Summary Judgment (R. Doc. 41-8), and as re-attached to Target's Reply to Elwakin's Opposition to Target's Motion for Summary Judgment (R. Doc. 56-2).

**IT IS FURTHER ORDERED** that Defendant, Target's **Defendant's Motion for Summary Judgment (R. Doc. 41)** is **GRANTED IN PART** and **DENIED IN PART.**

It is **DENIED** as to Elwakil's discrimination claim.

It is **DENIED** as to Elwakil's hostile work environment claim.

It is **DENIED** as to Elwakil's retaliation claim, but it is **GRANTED** to the extent that this claim was premised upon her filing of a Charge of Discrimination with the EEOC.

It is **DENIED** as to Elwakil's potential entitlement to punitive damages.

New Orleans, Louisiana, this 9th day of October 2012.

**KAREN WELLS ROBY
UNITED STATES MAGISTRATE JUDGE**