## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WAFAA ELWAKIN, ET AL.**　　　　　　　　**CIVIL ACTION**

**VERSUS**　　　　　　　　　　　　　　**NO: 11-2648**

**TARGET MEDIA PARTNERS**　　　　　　**UNITED STATES MAGISTRATE**
**OPERATING COMPANY LLC**　　　　　　**JUDGE KAREN WELLS ROBY**

### ORDER & REASONS

　　This matter was before the Court for non-jury trial on October 15 and 16, 2012, upon consent of the parties pursuant to 28 U.S.C. § 636(c).[1]  The Plaintiff, Wafaa Elwakil, ("Elwakil"), and the Defendant, Target Media Partners Operating Company, LLC, ("Target") were represented by counsel and all parties and their witnesses appeared before the Court.[2]

　　Elwakil filed this Complaint pursuant to the Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII") and Louisiana state law.[3]  Elwakil claims that Target subjected her to (1) discriminatory treatment for her race, religion, and ethnicity; (2) a hostile work environment; and (3) unlawfully retaliated against her for filing a Complaint with the Kenner Police Department.

　　Prior to trial, in a February 29, 2012 ruling made in connection with Target's Motion to

---

[1](R. Doc. 11).

[2]Elwakil was incorrectly named as "Elwakin" in her original petition, which is reflected in the caption of this case.

[3]Elwakil's Complaint refers to "Delgado and its agents."  It is not clear who "Delgado" refers to in this instance.

Dismiss, the Court noted that Elwakil's state-level allegations were not clear, as they pertained to "statutory or regulatory prohibitions against discrimination and harassment and retaliation." (R. Doc. 28, p. 4). All of her state law claims were dismissed at that time. *Id.* at 10. Further, in an October 9, 2012 ruling made in connection with Target's Motion for Summary Judgment, Elwakil's Title VII retaliation claim was dismissed in part, to the extent that the claim was premised upon her filing of a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (R. Doc. 64, p. 43). Therefore, the claims remaining at trial were Title VII causes of action for (1) discrimination, (2) retaliation, and (3) creation of a hostile work environment.

**I.    Testimony and Evidence at Trial**

This is an employment discrimination case in which the employment relationship between Elwakil, a longstanding salesperson with News on Wheels, deteriorated rapidly after the company was acquired by Target. The "active" legal ingredients are a shattered friendship, an alleged handful of discriminatory comments, a roll of paper towels brandished at a staff meeting, and a police report.

The following witnesses testified at trial: Elwakil, Anthony Giusti, ("Giusti") Toya Domineck, ("Domineck") Linda Coffman, ("Coffman") Karen Heinze Morgan, ("Heinze") and Vahid "Vic" Parvinjah, ("Vic"). Giusti, who is a Caucasian man, was a longtime sales representative who worked with Elwakil. Domineck, who is an African-American woman, is a Regional Area Manager at Target, and was both Elwakil and Giusti's direct supervisor at the time both employees left the company. Coffman, who is a Caucasian woman, is a Vice President at Target, and Domineck's direct supervisor. Heinze, who is a Caucasian woman, is Target's nationwide director of Human Resources. Vic, who is a Persian man, is a minority shareholder of Target.

2

A.      **Elwakil's General Background**

Elwakil is an Egyptian-born woman of Arab ancestry, who is also a practicing Muslim. She worked as a salesperson for News on Wheels, a trade magazine based in Kenner, Louisiana, which advertises used cars. As a salesperson, Elwakil was responsible for building relationships with local car dealers and inducing them to advertise their cars in the publication. Elwakil worked at the company from 1995 to 2009, during which time it was bought and sold several times.[4]

Witnesses from both sides testified that Elwakil was a qualified salesperson. Giusti, her longtime coworker, characterized Elwakil as "very tenacious" and "able," and referred to her as the "Egyptian Magician," purportedly for her ability to close accounts. Similarly, Target's management, as represented at trial by Domineck, Coffman, and Heinze, conceded that Elwakil's sales performance was at least adequate.[5] On the other hand, Elwakil was also known to be dramatic; in one instance, she showed up at one customer's business dressed as a man in order to attempt to get "in front" of the customer without the customer's knowledge.[6]

Elwakil's troubles with Target began in 2007, shortly after Target acquired ownership of News on Wheels. Elwakil confirmed receipt of Target's "Employee Handbook" on June 20, 2007, which indicates that she was an "at will" employee who could be terminated at any time. (D's Ex. 3, p. 1). After Target acquired the company, it began implementing changes which ultimately resulted in the elimination of the entire Kenner outside sales force, including, on February 23, 2009,

---

[4]These changes in ownership were not detailed by the parties, and are immaterial for present purposes.

[5]Although Elwakil's sales performance was characterized as "adequate" both before and after Target's acquisition, witnesses for Target testified that Elwakil's sales figures were "declining" at the time Elwakil's employment was terminated. It was not clear how rapidly her figures were declining, and in any event no witness testified that this decline provided grounds for the ultimate termination decision.

[6]The date of this incident was left unspecified.

Elwakil.[7]

**B.      Target's Business Philosophy; Acquisition of News on Wheels**

Coffman provided testimony about Target's general business philosophy and market strategy.  Target is a national trade media conglomerate which specializes in trade publications such as News on Wheels.  Target locates businesses which it views as underperforming, acquires them, and then uses a variety of methods to increase profitability for its new owners.[8]  In the past, Target has achieved this goal by laying off a percentage of the local workforce, outsourcing operations to central processing centers, and implementing new workplace policies for those local workers who remain.  Target does not implement these changes in a vacuum; after each acquisition, Target's central management spends 4-6 months "getting to know" the staff at the acquired company before implementing any changes.  Coffman's role as Vice President is to assist the General Managers to achieve better results "on the ground" once those changes begin to take place.

Coffman testified that after Target acquired News on Wheels and had "gotten to know" its employees, it found several inefficiencies "on the ground" which required correction.  Specifically, Target found that News on Wheels' two locations in Kenner and Baton Rogue, Louisiana duplicated functions; certain clerical functions could be outsourced to a central processing center.  Further, News on Wheels' sales force was underutilized, in that the salespeople only sold ads, instead of being required to go "into the field" to take pictures of their cars, and perform other clerical functions arising in connection with their listings.  Target also required more "face time" from the outside sales force, requiring them to report to work five days a week, regardless of whether they

---

[7]February 23, 2009 is also the date Elwakil listed on her claim for unemployment insurance benefits.  (Pl.'s Ex. 6).

[8]Target owns 75-80 publications nationwide.

could complete their assigned tasks in 2-3 days.  It also required the representatives to "check in" with the central office more often.[9]  Target also modified the sales team's expense reimbursement scheme by disallowing reimbursement for client lunches and downgrading the "standard allotment" for gas to $50 per week.

To implement these changes, Target originally attempted to work with News on Wheels' existing management, as represented by Carl Mysig, ("Mysig") and Ken Masson, ("Masson") both Caucasian males.  However, Target's central management remained unsatisfied with the company's financial performance, and refused to accept the proffered reason for depreciated sales figures - namely, that in the aftermath of Hurricane Katrina the population of New Orleans had been drastically reduced, the number of used cars in the city had plummeted, and the local market was still recovering.

### C.    Target Hires Domineck, Promotes Her to Manager, and Implements Reforms

During the time when Target was "getting to know" the News on Wheels business, it had also hired Domineck to work out of the Kenner office as a sales representative.  Domineck was already known to the owners of Target.  She built her career as a trade publications manager in the Los Angeles area, and in her prior job she had met "some of the people" who now owned Target.[10]

In her new role as a Target salesperson, Domineck often drove with Elwakil to learn the sales routes.  During these drives, she engaged in both business and personal conversation with Elwakil; indeed, up until the time she accepted Elwakil's resignation, she considered Elwakil to be a "friend."

---

[9]Although the extent of this "checking in" was not illustrated by either party, it is immaterial to the outcome of this Order and Reasons beyond serving as an illustration of the types of changes Target made.

[10]At trial, Domineck stated that she had characterized these people as the owners of Target's successor company.  The relationship between these "people" and their acquisition of ownership in Target was not explained at trial, and is not relevant for present purposes.

During these drives, Elwakil revealed to Domineck that she was unhappy with Target's current management practices and, according to Domineck, spoke several times of resigning.

By January 2009, Target had "gotten to know" News on Wheels, and implemented its new policies. In order to enforce them, it hired Domineck as Target's General Area Manager for both the Kenner and Baton Rouge offices. In this new role, Domineck reported directly to Coffman.[11]

The "implementation" phase did not end well for the existing sales force. According to Elwakil, at the beginning of each staff meeting Domineck noted that unless sales figures improved, sales staff would be subject to termination. These were not empty threats; Domineck first terminated the employment of Paul Spencer, ("Spencer") a Target salesperson, because Spencer did not meet work goals.[12] She later terminated the employment of another salesperson, Giusti, because he purportedly left work early on one day. By the time of trial, no member of News on Wheels' Kenner-based sales force remained on Target's payroll. Giusti characterized Domineck's overall management style and office presence as "threatening" due to the specter of job termination, although he also testified that he had never seen Domineck physically threaten any other Target employee.

### D. **Tensions with Elwakil Rise**

After assuming her managerial role at Target, Domineck continued to ride with Elwakil approximately once a week. Domineck told Elwakil that Target planned to terminate a number of staff members, and offered Elwakil a job as an "inside manager." Elwakil stated that she did not

---

[11]Domineck did not move directly into a managerial role; instead, she accepted a new position at a competing business, but quit prior to her first day in order to take the Area Manager job at Target.

[12]Spencer was also a Caucasian male.

want the "inside" job.[13]   Instead, Elwakil had become increasingly difficult to work with.   For example, Elwakil became a vocal critic of Target's changes to company policy, specifically (1) the policy regarding additional clerical duties, (2) the requirement that salespeople were to go "into the field," (3) changes in the expense plan which disallowed billing of client lunches to the company, and (4) the downgrade of the gas allotment to $50 per week. According to Domineck, Elwakil often voiced her complaints to other Target employees.

By contrast, Elwakil testified that Domineck forced her to complete more burdensome tasks than other sales staff.   For example, Elwakil claims that she was locked out of the computer and that she was not given instruction on how to work from home.   Further, she stated that not every salesperson had to proof their own advertisements and take their own pictures, although she did not specify how this occurred.   Elwakil stated that other Target salespeople and clerical staff could have "helped" her, but failed to do so.   Nevertheless, Elwakil testified that the failure of her coworkers to help her was not borne out of animus for Elwakil's status in any protected class.

Domineck testified that these protestations, as well as Elwakil's demeanor, caused Target to be perceived negatively, which hurt business.   Although Target does not have a progressive disciplinary system, it was Target's general policy to provide employees with "coaching."   Elwakil received such "coaching" from both Mysig and Domineck.   However, Coffman testified that this "coaching" was ineffective, as Elwakil continued to voice complaints about Target's new policies.

E.    **Domineck's Comments**

Elwakil and Giusti both testified that Domineck made several derogatory statements about Arabs.   According to these witnesses, Domineck stated that Arabs were "crazy," "stupid," "needed

---

[13]The details of this "inside sales job" were not explained at trial.

to go home," and were "a pain in the ass to deal with."

Giusti testified that these comments were made both to himself personally, to others, and directly to Elwakil.  He testified that Elwakil appeared to be upset by the statements.  Although Giusti could not recall how many statements were made, he testified that they had been made prior to each sales meeting.  Giusti, who had been a News on Wheels employee from 1984 through 2009, testified that prior to Domineck's arrival he had no experience with discriminatory statements at News on Wheels' business.[14]  Giusti testified that Domineck "may have" made derogatory remarks about Arabs prior to the time she became a manager.

Elwakil also stated that Domineck had made such derogatory remarks at virtually every meeting, as well as every time she came to the Kenner office.[15]  Elwakil also testified that Domineck made discriminatory comments prior to assuming her role as manager.  Elwakil suggested that these comments were linked to what Domineck saw on nighttime television news programs.  Elwakil also testified, without further elaboration, that her race, religion, and national origin played a "big" role in the "events" of February 2009.  She also testified that Target's employee handbook required her to report all acts of discrimination to the company's Human Resources Department.  (D's Ex. 3, p. 1).

Neither Elwakil nor Giusti ever contacted Target's Human Resources Department to complain about Domineck's comments.  Giusti testified that Target's workplace was not devoid of charged language, as he himself referred to Elwakil as the "Egyptian Magician," a term of

---

[14]Giusti testified that he had never had a problem working with either female supervisors, or supervisors from a specific racial or ethnic group.  Indeed, he had been hired at News on Wheels by a female supervisor, under whom he worked for several years.

[15]Domineck testified that she split her time between the Kenner and Baton Rogue offices, although she did not indicate the amount of time spent at either location.

endearment which reflected Elwakil's high sales performance, and which Elwakil appreciated. Elwakil confirmed that she used the phrase "Queen of Egypt" on her outgoing work emails.[16]

Target's witnesses vehemently denied the accusation that any discriminatory statements had been made. Domineck testified that she never made any derogatory comments about Arabs, Egyptians, or Muslims; Coffman also testified that she had never heard Domineck make any derogatory statements. Domineck also testified that she had worked with other "middle eastern" people before, although she could not explain how she knew these people were "middle eastern" other than the fact that they had informed her of the same.

Both Domineck and Coffman testified that in 2009 they were aware that Elwakil was of Egyptian descent, and that her outgoing email indicated that Elwakil claimed to be the "Queen of Egypt." However, Domineck testified that she was not aware whether Elwakil was Arab or Muslim, even though she and Elwakil had discussed some details of their personal lives during Domineck's early days at Target. Domineck also admitted that once she became a manager, she would have had access to Elwakil's personnel file and would have been able to determine whether Elwakil had requested vacation time to observe religious holidays.[17] Elwakil testified that she had in fact requested, and had been granted, time off to observe such religious holidays.

---

[16]Elwakil also testified that she in fact took religious holidays while at Target, which her managers knew about, including Domineck. She stated that between February 1 and 23, 2009, Target prevented her from practicing her religion because she was required to fast on Monday and Wednesday every week all year long. However, there was no evidence in Elwakil's personnel file that she ever took time off for religious holidays; instead, there is evidence that Elwakil took a "family vacation" to Egypt.

[17]Target's workforce was large enough to obligate the company to file EEOC forms regarding the diversity of its workforce, and stated that a copy of the form indicating Elwakil's demographic information would have gone into Elwakil's personnel file. However, upon inspection of the personnel file submitted into evidence, the Court could not locate this particular form. Heinze stated that there were apparently two "different" personnel files: one in the field, and one in the central office where she worked. Heinze was also confused as to whether Target submitted "separation" forms on the regular basis, although these forms are required to be submitted under Louisiana law. After Heinze's testimony on the first day of trial, Target was obligated to supplement the personnel file which it had previously disclosed to Elwakil in discovery.

F.      **Elwakil's Resignation and Acceptance**

At the time she became Target's manager, Domineck was already familiar with the process of making employment termination decisions.  Domineck knew, based on her prior experience as a manager at a California-based business, that she would need written confirmation of Elwakil's resignation.  Domineck also knew, based on prior managerial experience, that it violated federal law to create a hostile work environment, retaliate, or discriminate against an employee on the basis of that employee's membership in a protected class.  In January 2009, after assuming the job as manager of Target, Domineck reviewed Target's policies and procedures, which included information on compliance with Title VII.  At that time Domineck also reviewed Target's specific HR policies with Heinze, who after the review session was satisfied that Domineck understood the process of terminating an employee.

Thereafter, Domineck warned Elwakil that, based on her prior threats to resign, any similar future attempt to resign would be accepted.  On February 11, 2009, Domineck received a call from Elwakil, during which she testified that Elwakil tendered her resignation.  Elwakil disagrees, and testified that the phone call was instead a request to take one week of vacation time beginning in late February 2009, so she could travel to Egypt and visit her cancer-stricken mother.[18]  Elwakil testified that when she called Domineck to request time off, Domineck responded, "you just gave me your resignation, don't fuck with me," and hung up.  After Domineck told Elwakil over email that she had already distributed Elwakil's accounts, Elwakil attempted to contact Heinze several times.

Following the phone conversation, an email conversation took place between Domineck and

---

[18]Although Elwakil testified that she had suffered emotional distress on account of being unable to visit her mother, in her testimony, Domineck contests whether Elwakil ever mentioned a vacation request during this phone call; indeed, Elwakil admitted that at her prior deposition, she had not mentioned suffering any mental anguish on this account.

Elwakil between February 11, 2009 at 1:42 p.m. and February 12, 2009 at 12:51 p.m.

> [*Elwakil*:] I will be going on vacation for one week on feb 25 2009.
> [*Domineck*:] This is not approved Wafaa....you gave your 2 weeks notice of resignation....why would you be turning in a 1 week vacation request. I'm confused.
> [*Elwakil*:] when did I give my 2 weeks resignation???
> [*Domineck*:] Don't play games with me Wafaa!!
> [*Elwakil*:] i'm serious ,I'm not.
> [*Domineck*:] I've already distributed your accounts to the reps!!!
> [*Elwakil*:] well I was not awar of ALL OF THAT , WHEN THIS HAPPENED

(Pl.'s Ex. 6) (all punctuation and grammar in original).  During the course of this email exchange, on February 11, 2009, Domineck emailed Coffman and stated, "just resigned.....!!! In my opinion...Great News!!! She Could Not move forward and it was becoming increasingly frustrating for me and she knew it!!!"  *Id.* (all punctuation and grammar in original).  Coffman stated that the decision to end the employment between Elwakil and Target no later than February 15, 2009 occurred, prior to Coffman's travel to the New Orleans area.

Although this email chain was complete on February 12, 2009, Domineck did not forward it to Heinze until February 20, 2009.  No explanation was offered for the delay; Heinze testified that there was no "formal process" for submitting paperwork to Target's upper management.  However, Heinze testified that at some point between February 11 and 18, 2009, Coffman and Domineck solicited her advice regarding Elwakil's termination.

G.      **Decision to Terminate; Contested Issue Over Termination or Resignation**

The parties also dispute whether Elwakil's employment was terminated, or whether she resigned.  Unsurprisingly, Elwakil testified that she was terminated; Domineck, Coffman, and Heinze testified that she resigned.  An Affidavit signed by Domineck was introduced into evidence, which states that Elwakil's employment had been "terminated."  (Pl's, Ex. 2). The "Termination Notice" in Elwakil's file contains boxes for both "Discharge" and "Resignation," but only the

"Discharge" box is checked, and no additional reason is given.  The form was prepared by Heinze, and approved by Domineck, with both dates listed as February 23, 2009.  Additionally, Elwakil's personnel file indicates that Elwakil applied for unemployment insurance benefits from the Louisiana Workforce Commission, listing her last day as February 23, 2009.  (Pl.'s Ex. 6).  Under the "reason for separation," Elwakil listed "Layoff/RIF/Part-Time."  *Id.*  In its response, the Commission stated to Elwakil that "[y]ou were discharged from your employment and given no reason.  There was no response from the employer to our inquiry about your separation."  *Id.*

Domineck, Coffman, and Heinze all attempted to explain this discrepancy.  Domineck testified that regardless of whether an employee "resigns" or is "terminated," the net effect was that the company was "terminating" the employment relationship.[19]  She also stated that Elwakil was not involuntarily terminated.  Coffman added that technically Target had "terminated" Elwakil's employment because she had resigned, and then tried to renege on her resignation.  Heinze noted that there was no reason given for the discharge on Elwakil's "termination" form.  She did not recall the time at which Domineck conducted a "termination interview" with Elwakil.  Domineck testified that there probably should have been an explanation in the written termination form which stated a reason.

Domineck testified that she did not seek the approval of Coffman, Heinze, or any other higher management authority at Target prior to deciding to terminate Elwakil's employment; moreover, she had no idea why Elwakil might have thought that Coffman was involved.  Coffman supported this position, testifying that as a Vice President, she would not be responsible for the

---

[19]There was also some discussion regarding the authorship of Domineck's Affidavit, submitted in support of Target's Motion for Summary Judgment.  Domineck stated that she authored the affidavit and agreed with the content, although Heinze had "cleaned it up."  In any event, Domineck testified that the contents of the Affidavit were true and correct.

termination decision, although she and Heinze would have "input" into the same.[20]  According to

Coffman, this "input" consisted of email and phone conversations between Coffman, Heinze, and

Domineck regarding the termination decision.[21]  Heinze testified that she had discussed the

termination decision with Domineck, but had never contacted Elwakil to obtain her side of the story.

H.    **February 16, 2009 Sales Meeting**

Several days after Domineck and Elwakil's  email exchange, on February 16, 2009,

Domineck and Coffman conducted a meeting with Target's Kenner-based sales staff to "loosely"

discuss sales goals.  Elwakil was present at the meeting.  The parties strongly dispute the character

and actions of the meeting.  Both Domineck and Coffman testified that Elwakil was disruptive, and

used the meeting to air her grievances about Target's ownership practices, as well as the inequity

of the sales staff's expanded ministerial responsibilities.  Coffman stated that this was not the first

time Elwakil had been disruptive in a meeting.  Domineck eventually told Elwakil, purportedly

jokingly, that if she did not stop talking, Domineck was going to "bop her on the head" with a roll

of paper towels.

Elwakil and Giusti paint a decidedly different picture, and their testimony is as follows:

Elwakil testified that Domineck made a discriminatory comment about Arabs 10-15 minutes prior

to the meeting; Giusti could not recall any such comment.  Prior to the meeting, Elwakil testified

that both Domineck and Coffman entered the room and kissed Masson, and that Coffman embraced

and kissed Elwakil; Giusti testified that Coffman had kissed Mason.  Coffman and Domineck then

---

[20]Although Coffman knew enough about Elwakil's job to know that it was "satisfactory." Coffman also stated that in her travels to Louisiana to oversee office progress, she had talked to Elwakil between 3-5 times a year.

[21]Previously, at her deposition, Domineck had stated that she had sought the approval of Heinze for Giusti's termination.

began the meeting by threatening to terminate sales staff if sales numbers did not improve.  After the meeting began, Domineck began pressuring Elwakil about her diminishing sales figures, and Elwakil attempted to invoke Hurricane Katrina as an excuse for why Target's sales goals were fundamentally unobtainable.  At some point Domineck cut off Elwakil and stated that "I don't want to hear these shit excuses about Katrina anymore," then picked up a roll of paper towels and told Elwakil that "if you don't stop talking I'm going to beat your ass."  Domineck then shook the roll of paper towels at Elwakil, and slammed the roll of paper towels on the table near Elwakil, where the roll fell over and touched her.  In reaction to the paper towel incident, Coffman slid away from table and stated "I'm not getting involved in this."

Thereafter Elwakil, who was visibly upset, exited and went into the employee bathroom to cry.  She then left Target to take pictures of the cars listed on her account.  She worked the full day.  Giusti could not recall any other physical threats made to other Target employees, or whether Domineck ever made any discriminatory statements after the "paper towel incident."  However, he characterized Domineck's activities at the February 16, 2009 meeting as both "offensive" and "intimidating."[22]

## I.      Elwakil's Last Day; Police Visits

At an unspecified time after the February 16, 2009 sales meeting, Elwakil contacted the police.  Elwakil testified that when speaking to the police, she expressed her "view" of the events of the February 16, 2009 sales meeting.  However, she did not call the police in order to retaliate against Domineck, but only wished to have a record of getting her possessions back from Target's

---

[22]Thereafter, at the February 16, 2009 sales meeting, Elwakil testified that Coffman kissed her on the lips, then attempted to kiss Giusti and Masson, but was rebuffed.

office, as well as establish proof that her employment had been terminated.[23]  Elwakil also testified that she was obligated to enlist the support of the police because she did not feel any "protection" from management.  Although Elwakil did not specify what "protection" meant, she later testified that she went to the police in order to make a "record," because all of Target's employees were afraid of losing their jobs.  Elwakil testified that she never contacted the police to complain about Domineck's derogatory statements about Arabs, Muslims, or Egyptians, nor about Coffman's behavior.

Neither party introduced any evidence at trial showing when Elwakil first called the police.  However, later on February 16, 2009, at 4:09 p.m., Domineck emailed Elwakil stating, "lets meet tomorrow regarding your last day which I think you told me would be 2/24[] Let me know what time works for you."[24]  Elwakil replied on February 17, 2009, stating "I will meet with you anytime you want, but still I have not turned any resignation to anyone."  Later that day Domineck replied: "You resigned with me last Wednesday and I accepted.....I will be in the office at 10am..."  (Pl.'s Ex. 1).

At some point between February 16 and 23, 2009 - the date was left unspecified - Domineck and Coffman had a 45-minute meeting with Elwakil, in which they attempted to obtain her resignation by persuading her to sign pre-filled documents.[25]  Elwakil testified that during the course of the meeting, Coffman told her "you're not expecting us, after you called the police, to keep you in the company," and then asked Elwakil why she called the police.  Elwakil testified that at that

---

[23]Her personal property included a camera, a binder, two pens, and several other items on her desk.

[24]This email exchange was in Elwakil's personnel file, which was provided to the Court in its entirety for the first time at trial.

[25]Elwakil testified that this meeting took place "before" February 23, 2009, but did not otherwise specify the date in question.  The specific documents which Coffman and Domineck requested that Elwakil sign remained unspecified.

time, she told Coffman that she did not feel "secure."  During the meeting, Coffman and Domineck also specifically asked Elwakil whether she had been "offended" by what had occurred at the February 16, 2009 sales meeting.  Elwakil stated that she was "extremely scared."

On February 20, 2009, an officer from the Kenner Police Department arrived at Target's Kenner office and asked for Domineck.  It is not clear at what time of day they arrived.  Domineck, who was not in the office when they arrived, learned of the visit through an office manager.  The officer asked if Elwakil was still employed.  Domineck testified that she had no idea why the police would have been at Target, nor that Elwakil would have been complaining about her conduct at the February 16, 2009 sales meeting, although she admitted that it showed that Elwakil was upset.  However, also on February 20, 2009, at 12:42 p.m., Domineck emailed Heinze the string of February 11-12 emails between herself and Elwakil regarding Elwakil's "resignation."[26]  Henize testified after Target's Kenner office staff informed her that the police had arrived on February 20, 2009, she called the police.  The contents of Heinze's conversation with the police were not made part of the record.

On February 23, 2009, Elwakil's last day at Target, the police again appeared at Target's Kenner office; this time, Domineck was physically present.  The police asked Domineck about her "conduct" at the February 16, 2009 sales meeting, and asked her to give a statement about the events in question, which she did.  The police indicated that the events of February 16, 2009 were not a criminal matter, and failed to question her about whether she had made any discriminatory comments.  After obtaining Domineck's statement, the police facilitated the exchange of personal property, and then escorted Elwakil off of the premises.  In her years as a manager, Domineck

---

[26]In her subsequent communications with Heinze, Domineck stated that Elwakil had resigned, instead of being terminated.  Domineck also received a termination form from Heinze prior to February 23, 2009.

testified that she had never experienced police presence on an employee's last day.  Moreover, Domineck testified that the sole purpose of the February 23, 2009 meeting was to allow Elwakil to return company property.

Elwakil introduced into evidence an Affidavit by Domineck, to which was attached a "summons" issued by the Kenner Police Department on March 17, 2009, which alleges that on February 16, 2009, Domineck violated municipal code by "disturbing the peace" and making "threats."  (Pl's Ex. 2, p. 12).[27]  Although Domineck testified that she had "authored" the Affidavit, no specific testimony about the Summons was elicited at trial, and the Summons was not itself independently verified.  The Summons is undated, although Domineck's Affidavit states that the police issued it on March 17, 2009.  *Id.* at 5.  Domineck's Affidavit states that the police had been called because she "banged on a table and threatened [Elwakil].  I told the police officer that I did not bang on the table and certainly did not threaten [Elwakil].  I then realized that [Elwakil] was focusing on my paper towel comment and told the police officer about it."  *Id.* at 4.[28]

## J.    **Aftermath; Giusti's "Interview" with Private Investigator**

As noted above, Elwakil's departure was not the last.  The next salesperson to lose his job was Giusti.  Giusti testified that after Elwakil's termination, he was "pulled out" of a subsequent

---

[27]Some, but not all, of the pages of Plaintiff's Exhibit 2 are not all numbered; the Court has "numbered" the unmarked pages in the order in which they appear in Exhibit 2.

[28]On summary judgment, the Court noted that Target had attempted to introduce evidence of a document, purportedly from the "City of Kenner" which stated that Domineck had been "charged" on February 16, 2009 with "DIST THE PEACE; DISORDERLY CONDT," for which the "disposition" of the charge was "Placed on Diversion Program, upon completion case dismissed."  (R. Doc. 41-9, p. 8).  There, the Court noted that this document was not properly authenticated under Federal Rules of Evidence 901(b), and therefore was not considered at that time.  *See* (R. Doc. 64, 10-13).  At trial neither party sought to authenticate the document, let alone introduce it into trial.  None of the witnesses testified about the outcome of the judicial proceedings; indeed, the parties failed to introduce into evidence any documentation of reports compiled by the police in connection with either their February 20 or 23, 2009 visits to Target's Kenner office.  Therefore, for purposes of trial, the subsequent steps in the judicial process are completely unknown to the Court.  However, for purposes of the Court's decision, it is irrelevant whether Domineck actually pled guilty to these charges or not.

Target sales meeting by Coffman, who walked him down the hall and to another room, where a private detective was waiting. Coffman shut the door behind Giusti after he entered the room, leaving Giusti alone with the investigator. The investigator asked Giusti for a statement regarding the February 16, 2009 sales meeting, which Giusti refused to provide.

After exiting the room, Giusti told Coffman that he did not appreciate the false pretenses of being brought into the room, then called Karen Heinze to express the same sentiment. He told Heinze that he took medicine for high blood pressure, and he was going home early. Based upon leaving work without permission, Target, through Domineck, terminated Giusti's employment.[29] The stated reason for Giusti's termination was that he left work early without permission. Giusti then began operating his own business, hiring Masson as an employee. Giusti testified that he maintained a good post-employment relationship with his former employer, as he worked after his termination to collect past due balances from one of his accounts.

Elwakil testified that after separating from Target, she kept in touch with several of her coworkers, who would "help each other out." She also sought alternate employment. She applied to a variety of jobs, both inside and outside her field; however, she only received two interviews - one to be a private security guard, and the other as a part-time sales representative. She stated that although she knew Giusti had started a competing business, she never approached him seeking any type of employment. Giusti testified that he probably could not afford to hire Elwakil.

When asked about what "emotional impacts" the "events of February 2009" had on her, she testified that she lost her job, her benefits, her ability to put her son in private school, as well as her dignity. She also testified that she never told the police about any alleged discrimination by

---

[29]Giusti stated that he had considered leaving Target before they terminated his employment; however he testified that he did not intend to "pilfer" clients from Target when he left.

Domineck.  Heinze, Coffman, and Domineck all testified that the first time they received notice that

Elwakil believed that Target had discriminated against them came when she filed a complaint with

the EEOC during the Summer of 2009.

## II.    Findings of Fact and Conclusions of Law[30]

As noted above, Elwakil seeks recovery on three Title VII theories: discrimination, hostile

work environment, and retaliation.  Target moved for a "directed verdict" of all three claims at the

close of Elwakil's case-in-chief.[31]

### A.    Discrimination

After the culmination of Elwakil's case in chief, Target moved for a "directed verdict,"

arguing that Elwakil herself identified as white.[32]  The Court stated as follows:

> Let me say this.  On the deconstruction argument, Wafaa just got off the stand. . . .
> There was a question posed to her . . . the gist of it is, 'everybody felt afraid . . .
> about being discharged.  Not one time did I hear Wafaa tell me that she felt she was
> discharged because she was Muslim; not one time did I hear Wafaa tell me that she
> felt she was discharged because she was Arab.  In fact, when questioned about what
> was her origin, her nationality, and her faith or religion, Wafaa was confused as to
> the three.  I don't think for a minute that the reason she was discharged was because
> she was Egyptian.  If they didn't want an Egyptian there, she wouldn't have been
> there fifteen years.  She wouldn't have lasted that long.  If they didn't want . . . a
> Muslim there, they would not have honored Ramadan and let her take her spiritual

---

[30]To the extent the findings of fact are conclusions of law, and vice versa, they are deemed so and accepted.

[31]Target's motion for a "directed verdict" is more properly viewed under the standard for judgment on partial findings.  Federal Rule of Civil Procedure ("Rule") 52(c) provides that "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party."  *Id.*  A Rule 52(c) judgment on partial findings "must be supported by findings of fact and conclusions of law as required by Rule 52(a)."  *Id.*

[32]Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prevail on a discrimination claim, a plaintiff must show, by preponderance of the evidence: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee who is not a member of her protected class.  *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

holidays.  She even said that they didn't interrupt that.  She contradicted herself, but that wasn't the real reason she was terminated.  I grant [Target's] motion as to the three bases: Arab, Muslim, and Egyptian . . . .

Thus, Elwakil's Title VII discrimination claims are dismissed.

## B.    Hostile Work Environment

Target also moved for a "directed verdict" of Elwakil's hostile work environment claims.

The Court stated as follows:

I'm looking at Fifth Circuit law on the issue.  And according to the Circuit Court, [for] a hostile work environment claim . . . there must be constant and pervasive problems, an that isolated incidents don't qualify.  Examples of the type of instances in which the court has found that periodic or occasional statements were not sufficient can be found in *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644 (5th Cir. 2012), wherein the Court found that there was no hostile work environment where over a ten-year period an employee was called a racially derogatory term on one occasion and saw a poster or letter derogatory towards Hispanics on another.  In a similar case, one of my colleagues in 2004 in *Jones v. Continental Cuisine, Inc.*, 353 F. Supp.2d 716 (E.D. La. 2004) . . . held that there was no hostile work environment from one use of the term "nigger."  In sum, where a single or an isolated incident can give rise to a claim if it's severe enough, the claims are rare[] and usually involve physical violence.  In this case, we have what can be perceived, and I think we need more testimony, on whether what occurred during that meeting by Ms. Domineck, meets the standard as illuminated by the Fifth Circuit, and noted by my Chief Judge Sarah Vance in the *Melson v. Chetofield* case [No. 08-3683, 2009 WL 537457 (E.D. La. Mar. 4, 2009], that in the instance where you have some semblance of violence or assault or fear of harm, that alone may be sufficient to create a hostile work environment.  So the request for dismissal is denied.

To properly allege a claim for hostile work environment under Title VII, a party must prove "(1) [racially] discriminatory intimidation, ridicule and insults which are (2) sufficiently severe or pervasive that they (3) alter the conditions of employment and (4) create an abusive working environment."  *DeAngelis v. El Paso Municipal Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995) (finding that four printed derogatory references directed specifically at plaintiff at irregular intervals over two and a half years did not constitute sufficient hostility as a matter of law); *Cavalier*

*v. Clearlake Rehabilitation Hospital, Inc.*, 2008 WL 2047997, at *4-*5 (S.D. Tex. May 12, 2008) (extending *DeAngelis* hostile work environment test to case involving allegations of racial discrimination).[33]   Moreover, the employer must have actual or constructive knowledge of the discrimination.   *Jones v. Flagship International*, 793 F.2d 714, 721 (5th Cir. 1986).

Elwakil's hostile work environment claim hinges on a finding of disparate treatment, for which she must prove that "the employer simply treats some people less favorably than others because of their race . . . religion . . . or national origin."   *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).   "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.   These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).   "So long as the environment would reasonably be perceived, *and is perceived*, as hostile or abusive, there is no need for it also to by psychologically injurious."   *Id.* at 22 (emphasis added) (citation omitted).

Courts have cautioned that "[t]he mere utterance of an . . . epithet which engenders offensive feelings is not enough" to establish a hostile work environment.   *Harris*, 510 U.S. at 23.   "A recurring point in [Title VII] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"   *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).   "These standards for judging hostility are sufficiently demanding to

---

[33]*See also Hernandez*, 670 F.3d at 654-57; *Jones*, 353 F. Supp. 2d at 720.  In sum, "[w]hile a single or an isolated incident can give rise to [a] . . . claim if it is severe enough, these claims are rare and usually involve physical violence."  *Melson*, 2009 WL 537457, at *4.

ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Id.*  (internal quotation marks omitted).  *See also DeAngelis*, 51 F.3d at 594 (finding that specific attempts to target the plaintiff with boorish, chauvinistic language were set in the context of an attempt at "humor").

Even a series of utterances, without more, is unlikely to qualify as a hostile work environment.  *Cuthbertson v. American Federation of Government Employees*, 2012 WL 4321742, at *3 (N.D. Tex. Sept. 21, 2012) (finding that three statements in which employee's mentor referred to him as a "young white boy," that he had only gotten his job "because [he is] white," and that one "can't trust a white committee because the white guys are always out to steal money from the local" were insufficient to demonstrate a hostile work environment).  Instead, courts have found hostile work environment claims to occur where the conduct is either continuous, or coupled with clear alternate indicia of discrimination.  *See, e.g.*, *Jackson v. Wilson Welding Service, Inc.*, 2012 WL 12807, at *5-*6 (E.D. La. Jan. 4, 2012) (finding that African-American employees who worked for company over approximately two-month period demonstrated the presence of a hostile work environment were, *inter alia*, they were provided with substandard sleeping quarters, were called "boy," overheard their coworkers using the "N" word, telling racially charged jokes, wearing confederate flags almost every day, and failing to remove racist graffiti from workplace); *Jones v. Delta Towing LLC*, 512 F. Supp. 2d 479, 487-88 (E.D. La. 2007) (finding hostile work environment where plaintiff alleged that, *inter alia*, over six month time period, supervisor and coworker used the term "nigger" whenever plaintiff was in the room, and plaintiff was told a story about the drowning death of a black man while out at sea).

22

As a threshold matter, the Court finds the Elwakil and Giusti's testimony regarding Domineck and Coffman's "kissing" of Target employees prior to the February 16, 2009 meeting is not credible.  Elwakil testified that Domineck and Coffman kissed Masson, whereas Giusti only testified that Coffman had done so.  Therefore this fact, as well as the testimony that Coffman had embraced and kissed Elwakil, lends no weight to the Court's analysis.

Here, as noted above, the parties sharply contest whether Domineck ever made derogatory statements about Arabs.  Domineck and Coffman argue that no such comments were ever made.  By contrast, Elwakil and Giusti both testified that Domineck made comments that Arabs were "crazy," "stupid," "needed to go home," and were "a pain in the ass to deal with."  The Court finds that if Domineck made these statements several times over the course of the first two months of 2009, they could rise to the level of creating a hostile work environment cognizable under Title VII.  However, in this case they did not reach this threshold for several reasons.

First, although the comments are patently offensive, their total number is unknown.  Elwakil testified that Domineck made these derogatory comments at or before practically every meeting or every time she came to the Kenner office and before every sales meeting; however, the parties never clarified how many times Domineck was actually *present* in the office, how many sales meetings were conducted, or how many comments were made - all material considerations, given the fact that Elwakil worked under Domineck's supervision for only two months, and Domineck split her time between Kenner and Baton Rogue during that time.  Indeed, Giusti testified that he had only overheard "several" statements, indicating that the total number of statements made was low.  To the degree that Elwakil "proved" that such comments existed, therefore, she proved that only a handful had been made.  *See Cuthbertson*, 2012 WL 4321742, at *3.

More importantly, the atmosphere of the Kenner office was not otherwise devoid of questionable language; Elwakil testified that she herself responded favorably to charged phrases such as the "Egyptian Magician" and called herself "the Queen of Egypt" in her outgoing emails. Admittedly, there is a clear difference between Domineck's derogatory statements, and Elwakil and Giusti's apparently light-hearted attempts at humor, which go beyond the Supreme Court's caution that Title VII not be used to propagate a "general civility code." *Faragher*, 524 U.S. at 788. Moreover, to the degree that Domineck made such derogatory statements *after* she became a manager, neither Elwakil nor Giusti were obligated to report them. *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999) (finding that when supervisor had immediate or successively higher authority over plaintiff-employee, employee's failure to notify human resource department of complaints need not occur); *Reine v. Honeywell Intern., Inc.*, 362 F. App'x 395, 397 (5th Cir. 2010) (finding that an employee need not report the conduct in question shown when "a supervisor" engaged in the harassment).

However, the Court finds it probative that according to Elwakil, Domineck made derogatory statements about Arabs *before* she became a Target manager - yet Elwakil failed to report those statements to Target in accordance with the anti-discrimination policy in the employee handbook which she had received in 2007. Further, there is no indication that Elwakil mentioned Domineck's derogatory statements to the police when she contacted them in February 2009. Indeed, when given the opportunity to elaborate at trial about her motives for contacting the police, she testified that her only motives were to secure the return of her belongings from Target's offices, and to confirm that her employment had in fact been terminated - even though she testified that one of Domineck's derogatory comments about Arabs occurred just before the February 16, 2009 sales meeting. In

sum, if Elwakil were in fact troubled by Domineck's comments, she never adequately explained that they rose to the level of creating an "abusive" work environment.  *See Harris*, 510 U.S. at 23.

Nor does the Court find that Domineck's comments, when conjoined with the events of the February 16, 2009 sales meeting, suffice to create a hostile work environment for purposes of Title VII.  The February 16, 2009 staff meeting was clearly heated; however, the Court finds that both parties were responsible in part for the escalation.  Beginning a sales meeting by reminding employees that they can be terminated is a motivational technique not designed to put employees at ease.  The protracted argument between Elwakil and Domineck at the meeting, in which they discussed sales goals and argued about whether diminished sales figures were properly attributable to both parties, was likely a tense situation for all meeting participants.

The "violence" which eventually occurred - Domineck's brandishing a roll of paper towels in the air, and slamming the roll on the table next to Elwakil - was plainly *de minimus*, albeit unprofessional.  But even *after* the meeting and *after* Elwakil called the police, Elwakil clung tenaciously to her job and refused to accept resignation during the closed-door meeting in which Coffman told her that "you're not expecting us, after you called the police, to keep you in the company."

The Court acknowledges that there is certainly a point at which some factual admixture of derogatory remarks and physical violence will produce an environment which could be "reasonably perceived" as a hostile or abusive working environment for purposes of Title VII; the Court further acknowledges that the elements in this case could, if reacted to in a different manner, also give rise to such a claim.  However, the Court is obligated to also consider whether "the environment . . . *is perceived*, as hostile or abusive."  *Harris*, 510 U.S. at 22.  Here, the Court finds Elwakil's reaction

to the events in question telling - in that she inexplicably failed to report Domineck's discriminatory comments to either Target's human resources department or the police, and later refused to resign. As such, Elwakil's hostile work environment claims are dismissed.

### C.     Retaliation

Finally, Elwakil argues that Target unlawfully retaliated against her by terminating her employment after she called the Kenner Police Department on February 20, 2009. Target also moved for a directed verdict on the issue of retaliation. During argument on Target's motion, the following exchange took place:

> THE COURT: You're saying that the police was called out for the alleged assault, but they had no knowledge of any alleged discrimination, such that the employer, even if they acted based upon . . . the police coming to the scene, that that would not have been connected to any protected activity in this lawsuit. Is that what you're suggesting?
> TARGET: Correct.
> THE COURT: Okay, so respond to that very limited question, counsel.
> ELWAKIL: [There are] several data points that provide evidence sufficient to overcome this motion . . . you have testimony from my client . . . of discriminatory comments immediately before the meeting. . . .
> THE COURT: Such as? I don't remember any statements to that regard.
> ELWAKIL: She testified that 10-15 minutes before there was a comment right outside the meeting room about Arabs having to leave the country.
> THE COURT: What does that have to do with . . .
> ELWAKIL: It's the context, your honor. . . . the context is that you have that, then you have the confrontation in the meeting, with an immediate complaint to the police after that, and it's obvious that  that is the *coup de grace* . . . when you make a complaint to the police and it is about what is the final act of discrimination, that is a protected activity. . . . Ms. Domineck couldn't come up with any other reason other than what had happened in the meeting . . . [and] her dispute with Ms. Elwakil, for why the police might be there. . . . So the reasonable inference from the context is that she would know that was what the subject of the complaint was. That's why the plaintiff . . . .
> THE COURT: The reasonable inference? What? Say that again?
> ELWAKIL: The reasonable inference . . . . she could not come up with any other reason than the dispute with the plaintiff for why the police would be there. . . .
> THE COURT: Stop. . . . She could not come up with any other reason as to why the police could be there. What was the reason that she thought the police was there?

ELWAKIL: The dispute with the plaintiff.

THE COURT: That's too broad.  Was it not the issue with the . . . towels slamming on the desk and shooting out at Ms. Elwakil?

ELWAKIL: That would be the immediate incident.

THE COURT: Okay.  The question before me is about . . . the protected activity. The protected classification playing a role in that event as opposed to there being an assault. . . . The only thing I have in play is, did the company terminate her on the 23rd arising out of her protected activity, [which you claim is] lodging the complaint with the police.  That's your position?

ELWAKIL: Yes, your honor.

THE COURT . . . So proceed.

ELWAKIL: My client testified about a series of comments of background context, she testified as to comments that day immediately before the incident that we contend was violent or near violent in nature, and you can . . . infer relationships, as is common in employment law, from temporal relationship, so . . . if in the workplace I make a discriminatory comment, and then . . .

COURT: And then act out, you can connect the dots. I hear what you're saying. Motion on the retaliation denied.[34]

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  The practices made "unlawful" include discrimination on the basis of race, color, religion, sex, or national origin.  *Id.* at § 2000e–2(a).  Recovery under the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment," but rather encompass all actions which a reasonable employee would have found to be materially adverse.  *See Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 64-70 (2006); *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007).[35]

---

[34]For the sake of simplicity and clarity, several brief exchanges and other portions of dialogue have been omitted from the block quotation above.

[35]Subsequent Fifth Circuit decisions have declined to extend the holding in *Burlington* to other circumstances. *See Mitchell v. Snow*, 326 F. App'x 852, 855 (5th Cir. 2009) (finding that for Title VII *discrimination* claims, "adverse employment action" was limited to "ultimate employment decisions" such as hiring, granting leave, discharging, promoting, or compensating).  The Fifth Circuit has also declined to extend the "materially adverse" standard to employment-related retaliation provisions brought for Constitutional violations.  *See DePree v. Saunders*, 588 F.3d 282,

In order to state a claim for retaliation, a plaintiff must allege (1) she was engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 373 (5th Cir. 1998); *Hernandez*, 641 F.3d at 118; *see McCoy*, 492 F.3d at 556-57 (same).

### 1.    Target's Notice of Elwakil's Opposition

The first issue is whether Elwakil engaged in an "opposition" activity for purposes of Title VII. "The term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize . . . ; to content against; to confront; resist; withstand." *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 555 U.S. 271, 276 (2009) (citing, *e.g.*, Webster's new International Dictionary 1710 (2d ed. 1958)). "[I]t is clear that opposition . . . must be purposive." *Thompson v. Somervell County, Texas*, 431 F. App'x 338, 341 (5th Cir. 2011) (finding that plaintiff's request that supervisor provide a prior sexual harassment report, conjoined with the statement that she "was going to do whatever it took to make this right," did not constitute an "opposition" for purposes of Title VII, as plaintiff's stated reason for requesting report was to find alternate employment).

To satisfy the "opposition" requirement, Elwakil must demonstrate a "reasonable belief" that Target was engaged in unlawful employment practices. *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007). Not all "opposition" activity is protected under Title VII, but must be reasonable under the circumstances, which in turn involves balancing the company's

---

287-88 (5th Cir. 2009) (quoting *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997), and finding that in education context, "[a]ctions such as decisions concerning teaching assignment, pay increases, administrative matters, and departmental procedures, while extremely important to the person who has dedicated his or her life to teaching, do not rise to the level of a constitutional deprivation.").

interest against the employee's interests in airing grievances.  *Jeffries v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (finding that employee did not comply with stated company policies for airing grievances).  Courts have found that to "oppose" discriminatory conduct, a plaintiff must actually identify that the employer *engaged* in discriminatory conduct; it is not sufficient to refer to a protected category as the basis for making an independent action.  *See Johnston v. Georgia Pacific, LLC*, 2009 WL 2849619, at *3 (M.D. La. Sept. 3, 2009) (finding that where plaintiff stated in email that he was resigning for religious reasons, but failed to allege that he was *discriminated* by company on account of his faith, employee failed to "oppose" for purposes of Title VII).

In addition, the employer must have either actual or constructive knowledge of the employee's opposition.  *See Kroger*, 170 F.3d at 511-12 (finding that employee did not engage in a "protected activity" by conveying concerns to supervisor, but only when she filed a complaint in accordance with company policy); *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 702-03 (5th Cir. 2004) (citing *Kroger*).  Such "notice" is typically achieved by submission of a complaint to a company's human resources director.  *See Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 299-300 & n.3 (5th Cir. 2001) (finding that, in sexual harassment case brought under Title VII, employer "cannot be held liable for conduct of which it had no knowledge.").  When the individual alleged to have harassed the individual has supervisory authority over the individual, the employee need not show that she followed company policy by complaining about the conduct.  *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001).  Filing a police report can give adequate "notice" in the appropriate circumstances.  *See, e.g.*, *Worth v. Tyler*, 276 F.3d 249, 265 (7th Cir. 2001).

In this case, it is abundantly clear that Domineck ruled Target's Kenner office with an iron fist. Domineck's symbolic brandishing of the paper towel roll at the February 16, 2009 staff meeting dovetails with a larger pattern in which Target "got to know" the Kenner sales force, installed Domineck as an authority figure, and then systematically eliminated its entire outside sales staff - many of whom were decades-long employees. There is no doubt that the prior email exchanges between Domineck and Elwakil, as well as the heated staff meeting, were intended to "pressure" Elwakil to accept resignation.

These tactics did not work. Elwakil, plainly humiliated from Domineck's public attack on a job she had held for approximately fifteen years, and having recognized, correctly, that Target's upper management had already made a decision about the outcome of her employment, elected to enlist the assistance of an outside authority figure to make a "record" that she had not resigned. Domineck and Coffman then arranged a meeting in which they intended to coerce Elwakil's resignation; during the meeting Coffman stated "you're not expecting us, after you called the police, to keep you in the company," and then asked Elwakil why she called the police. Elwakil testified that at that time, she told Coffman that she did not feel "secure." During the meeting, Coffman and Domineck also specifically asked Elwakil whether she had been "offended" by what had occurred at the February 16, 2009 sales meeting. Elwakil stated that she was "extremely scared." Thus, the Court finds that Domineck's testimony that she had "no idea" why the police might have appeared at Target on February 20, 2009 is not credible; she, and by extension Target, both knew that the police arrival was a direct result of the events of the February 16, 2009 sales meeting, and that Elwakil had been the person who called the police.

Further, the Court finds that even accepting Coffman's argument that the decision to

terminate Elwakil's employment "had been made" prior to the February 16, 2009 meeting, if this "decision" was that Elwakil was to be terminated, and not to simply request her resignation, there would have been no need for the meeting in which Coffman and Domineck "pressured" her to do so. The Court finds it telling that Target's witnesses gave no adequate explanation for why Domineck only forwarded the February 11-12, 2009 "resignation" email string to Heinze on February 20, 2013, eight days after it occurred; or for why Heinze never contacted Elwakil regarding her difficulties at work despite clear indications that such difficulties were present. Three days after the police arrived, Elwakil's employment was terminated.

Given the temporal proximity between the February 16, 2009 meeting, the police presence at Target's business, the subsequent "pressure" meeting between Domineck, Coffman, and Elwakil, and the fact that Elwakil's last day of employment was on February 23, 2009, the Court finds that Target only decided to *terminate* Elwakil's employment *after* she filed the police report. As such, they plainly had "notice" of the report prior to the time they elected to "retaliate" against Elwakil by terminating her employment.

### 2.     Filing the Police Report

Having found that Target had notice of Elwakil's police report prior to making the decision to terminate her employment, the issue is now whether that report can qualify as an "opposition" for purposes of Title VII. Other courts have acknowledged that for a police report to qualify as an "opposition" to unlawful discrimination on the basis of an employee's race, color, religion, sex, or national origin, but to do so they must contain more than "generalized harassment." *Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 439 (W.D. Pa. 2010); *Hart v. Dallas County Hospital District*, 2013 WL 991249, at *5 (N.D. Tex. Mar. 13, 2013) ("Title VII does not outlaw generic

instances of 'intimidation' or 'harassment' in the workplace that are disconnected from discrimination based on 'race, color, religion, sex, or national origin.'"); *Matthews v. Mountaire Farms of Delaware, Inc.*, 2008 WL 1836692, at *5 & n.3 (D. Del. Apr. 22, 2008) (finding that police report could not qualify as a "protected activity" where the portion of the report relating to "Suspected Hate/Bias" was marked "No."); *cf. Castagna v. Luceno*, 2011 WL 1584593, at *11 & n.7 (S.D.N.Y. Apr. 26, 2011) (remarking without deciding that "it is dubious" that a police report which contained allegations of "assault and abuse" could qualify as a protected activity under Title VII).

As such, police reports which contain evidence of a criminal threat made in the workplace do not qualify without other indicia linking that threat to an activity protected under Title VII.  *See, e.g.*, *Labonia v. Doran Associates, LLC*, 2004 WL 1921005, at *10-*12 (D. Conn. Aug. 25, 2004) (finding no protected activity for filing police report, where plaintiff testified that assault giving rise to report was not sexual or discriminatory in nature); *Goddard v. Artisan Earthworks, LLC*, 2010 WL 3909834, at *6 & n.43 (D. Kan. Oct. 1, 2010) (finding that police report concerning criminal threats made by coworker against plaintiff and plaintiff's family did not fall under Title VII "discrimination," where plaintiff claimed that as a result of filing police report her employment was suspended for one week and then terminated); *Hawkins v. Miller*, 2007 WL 3400975, *4 (W.D. Ky. Nov. 13, 2007) (finding no retaliation for police report filed for coworker's physical threats); *Rossi v. Fulton County, Ga.*, 2013 WL 1213268, at *23 n.17 (N.D. Ga. Feb. 11, 2013) (finding that police report filed after plaintiff suspected she was "being watched" by a coworker in retaliation for filing grievance did not constitute a "protected activity," where the report "contain[ed] no allegations of discrimination based on race, color, religion, sex, or national origin").

Indeed, other courts have extended this reasoning and found that the facts of a police report must do more than gesture towards a person's membership in a protected class in order to qualify as a protected activity. *See, e.g.*, *Hounton v. Gallup Independent Co.*, 113 F. App'x 329, 333-34 (10th Cir. 2004) (finding no Title VII retaliation of African complainant who filed police report after altercation with coworkers who threatened to "show you we are Native American" and "told him to leave if he did not want to get hurt again"); *Northington v. H&M International*, 2011 WL 6934800, at *14 (N.D. Ill. Dec. 29, 2011) (finding that reporting of off-site battery by coworker did not constitute retaliation, where employee never informed company that battery was motivated by gender-based animus); *cf. Disilverio v. Service Master Professional*, 2007 WL 1029759, at *9 (W.D. Pa. Mar. 31, 2007) (finding that filing of police report where coworker rubbed coworker's face did not qualify as Title VII retaliation).

Here, there is no evidence that Elwakil brought Domineck's allegedly *discriminatory* comments to the police's attention when she contacted them after the February 16, 2009 staff meeting. Elwakil gives no explanation for this failure. Indeed, Elwakil testified that although she told the police about the events at the February 16, 2009 meeting, she never informed the police about the presence of any derogatory remarks. Further, Elwakil's motivation for contacting the police was not to have Domineck arrested or to complain about the discriminatory statements, but instead (1) "to have a record that I'm returning my stuff," and (2) "to have proof that I did not resign my [position] because they were forcing me to resign and I did not feel any protection[] from the office as managers or general managers." Elwakil's testimony leads to the conclusion that her request for "protection" did not stem from the presence of any discriminatory comments, but instead resulted from the fact that all of Target's employees feared losing their jobs.

33

There is no other indication in the record that Elwakil otherwise alerted the police of the racial motives underpinning her claim.  No police reports, incident report cards, or other indicia of the February 20 and 23, 2009 police visits to Target's offices have been submitted into evidence. The March 17, 2009 Summons was attached as an Exhibit to Domineck's Affidavit; it states that Domineck was being charged with two misdemeanor offenses:  "disturbing the peace" and "threats." (Pl.'s Ex. 2, p. 12).  As noted above, neither party submitted any documentation into the record at trial which stated that Domineck was actually *convicted* of either "disturbing the peace" or making "threats."

As such, Elwakil's complaints to the Kenner Police Department amount to nothing more than an allegation that Domineck made a physical threat against her, and subjected her to humiliation, all in an attempt to pressure her to resign.  Elwakil's police report is better viewed as a "generalized harassment," which did not implicate an activity made unlawful by Title VII. *See, e.g.*, *Hubbell*, 688 F. Supp. 2d at 439.

### 3.    "Reasonable Belief" of Discrimination from the Circumstances

The final issue is whether the Court can infer Target's intent to discriminate against Elwakil from the close timing between Domineck's derogatory comments, the violent act which occurred on February 16, 2009, Elwakil's contact with the police, and Target's decision to terminate her employment.  Here, the close timing between these activities could indicate that Target knew that Elwakil's "real" motive in contacting the police was to report Target's discriminatory behavior, and that Target's actual intent to discriminate against her can be inferred from context.

Even where the discriminatory basis is not stated in the body of a police report, some courts have found that where a criminal complaint or police report is "the culmination of discriminatory

acts," which the victim reasonably believes are the result of his or her status in a protected group, the plaintiff's notification to the police can qualify as a protected activity. *See, e.g.*, *E.E.O.C. v. Dinuba Medical Clinic*, 222 F.3d 580, 586 (9th Cir. 2000) (finding that plaintiff reasonably believed that physical assault was based on victim's gender); *Ancheril v. Department of Mental Retardation*, 342 F. App'x 659, 660-61 (2d Cir. 2009) (finding that plaintiff alleging Title VII retaliation claims must have a "good faith, reasonable belief that by filing police complaints, [the plaintiff] was opposing an employment practice made unlawful by Title VII.") (brackets omitted); *Funai v. Brownlee*, 369 F. Supp. 2d 1222, 1229-30 (D. Haw. 2004); *Weiland v. El Kram, Inc.*, 233 F. Supp. 2d 1142, 1153-54 (N.D. Iowa 2002) (considering issue of alleged sexual harassment by third party contractor which involved numerous occurrences of groping, where employee filed police report after employer stated that it would be at least two weeks until any grievance could be investigated). *Cf. Toomire v. Town & Country Janitorial Services, Inc.*, 2002 WL 140648, at *6 (D.N.H. Jan. 31, 2002) (finding that employee's seeking of restraining order in response to sexually based violence, conjoined with other workplace complaints, could constitute a "reasonable activity.").[36]

Here, the context does not remotely suggest that the Court may properly infer an intent to discriminate. As noted above, Elwakil testified that her reasons for contacting the police were related to securing the return of her property, and her desire to make a "record," purportedly because management had failed to "protect" her. Moreover, this particular reasonable belief standard has not been adopted by the Fifth Circuit.

In sum, the evidence, applied to the overwhelming weight of binding and persuasive

---

[36]Accordingly, where a police report is filed contemporaneously with a complaint to a company, the employee engaged in a "protected activity" by filing the report. *Alanlade v. AWS Assistance Corp.*, 2011 WL 1884339, at *3-*4 (N.D. Ind. May 18, 2011) (considering sexual assault claim).

authority, leads the Court to conclude that Elwakil did not engage in a "protected activity" for purposes of her Title VII retaliation claim.  As such, Elwakil's retaliation claim must be denied.

**III.**     **Conclusion**

Accordingly,

**IT IS ORDERED** that Plaintiff, Wafaa Elwakil's, ("Elwakil") claims for Title VII discrimination, hostile work environment, and retaliation are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 4th day of June 2013.

_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

36